LYTLE v MALADY

Docket No. 102515. Argued January 16, 1997 (Calendar No. 16). Decided July 31, 1997. Rehearing granted *post*, 1202.

Nancy Lytle brought an action in the Muskegon Circuit Court against Michael Malady, her supervisor, and Howmet Corporation, her employer, after she was discharged from her employment, alleging breach of a contract providing for termination of employment for just cause only, and age and sex discrimination. Howmet asserted that the discharge was the result of a company-wide reduction in its work force. The court, R. Max Daniels, J., granted summary disposition for the defendants on all counts. The Court of Appeals, D. E. HOLBROOK, JR., P.J., and MURPHY and J. C. KINGSLEY, JJ., reversed (Docket No. 157627). The defendants appeal.

In an opinion by Justice RILEY, joined by Chief Justice MALLETT, an opinion by Justice CAVANAGH, joined by Justice KELLY, an opinion by Justice BOYLE, joined by Justice WEAVER, and an opinion by Justice BRICKLEY, the Supreme Court *held*:

Even when an employer's decision to reduce its work force is determined to be bona fide, an employee still may establish a genuine issue of material fact that the employer's justification for the discharge was not the true reason for its decision. In order to establish a genuine issue of material fact when an employer contends that its decision to discharge the employee was based on a work-force reduction, a discharged employee may not rely merely on unsubstantiated allegations or denials in the pleadings, but, rather, must come forward with admissible evidence, affidavits, or other evidentiary materials, demonstrating the existence of a factual dispute that the employer's articulated reason was merely a pretext to discrimination.

1. Employment contracts for an indefinite duration are presumed to be terminable at the will of either party. To overcome the presumption, any verbal assurances or statement of policy and procedure regarding job security must be clear and unequivocal. A just-cause policy may be changed unilaterally to one of employment at will by giving reasonable notice to all affected employees. In this case, the method of notification instituted was not reasonably calculated to uniformly assure awareness of the change from

termination only for just cause to employment at will for all the affected employees. Thus, the plaintiff's legitimate expectation of just-cause employment was left undisturbed.

2. A reduction in work force for economic reasons constitutes termination for just cause; however, layoffs that are conducted must be bona fide, i.e., necessitated by business conditions. To establish a genuine issue of material fact that the employer's decision was not bona fide, the employee may not rely merely on unsubstantiated allegations or denials in the pleadings, but, rather, must come forward with admissible evidence, affidavits, or other evidentiary materials, demonstrating the existence of a factual dispute.

3. The plaintiff's relief, if any, rests in the Civil Rights Act. Under the act, to survive a motion for summary judgment, once an employer articulates a legitimate, nondiscriminatory reason for laying off a plaintiff, the plaintiff must introduce sufficient evidence to support two findings: that the employer's articulated reason for laying off the plaintiff is a pretext, and that the true reason is discriminatory. Under some circumstances, a plaintiff may not need to introduce additional evidence because the plaintiff's prima facie case may establish that the employer's articulated reason for its adverse employment action is a pretext and, in so establishing, the plaintiff may have created a question of fact regarding whether the true reason is discriminatory. A plaintiff will not always present a triable question of pretext simply by disputing the employer's stated reasons. Simply disproving the employer's articulated reason will suffice if, and only if, disproving the employer's reason also proves discrimination. In other instances, simply disproving an employer's articulated reason will not establish discrimination, and the plaintiff would then have to introduce additional evidence. In all actions involving claims of discrimination, there must be evidence upon which reasonable minds could conclude that discrimination was the true motive for the employer's adverse conduct against the plaintiff. That there may be a triable question of falsity does not necessarily mean that there is a triable question of discrimination.

4. The plaintiff need not show that age was the determining factor in the defendant's decision to discharge her; rather, she need only prove that it was a determining factor. Despite the defendant's claim that it based its decision on economic necessity, the plaintiff produced evidence that would permit reasonable persons to conclude that age more likely than not was a determining factor in the adverse employment action the defendant took against the plaintiff. This evidence suggests that the defendant's reason for discharging

the plaintiff was only a pretext for favoring the younger hirees over the older plaintiff.

5. Viewing the evidence in a light most favorable to the plaintiff and drawing every reasonable inference in her best regard, the plaintiff created a genuine issue of material fact whether the defendant considered her sex in its decision to discharge her.

Justice CAVANAGH, joined by Justice KELLY, concurring in part and dissenting in part, stated that it is premature to decide whether defendants' alleged reduction in work force was bona fide because it is clear that discovery in this matter was not complete. Thus, remand to the trial court is required for the completion of discovery and to afford the plaintiff an equal opportunity to present further evidence.

In order for a defendant to show that it discharged a plaintiff for bona fide economic reasons, it must demonstrate that adverse business conditions existed and that the elimination of the plaintiff's position was necessitated by those conditions. Where a plaintiff's proofs show that the elimination of the position was not motivated by the alleged reduction in work force, but rather by some other illegal reason, summary disposition should be precluded.

Justice BOYLE, joined by Justice WEAVER, concurring in part and dissenting in part, stated that the plaintiff is not entitled to assert a legitimate expectation of just-cause employment where the handbook on which she relies disclaims any intent on the part of the employer to bind itself to the contents of the handbook. In conjunction with the disclaimer of contractual obligation, the policy language is insufficient to overcome the presumption of at-will termination. If the disclaimer were found to be inapplicable because it does not expressly mention plaintiff's department, then the entire handbook must be found inapplicable.

Because the plaintiff did not present evidence sufficient to raise a triable issue of fact that her position would not have been eliminated but for her age, summary disposition for the defendant was appropriate.

Justice BRICKLEY, concurring in part and dissenting in part, stated that summary disposition of the wrongful-termination claim was properly awarded to the defendant. Justice WEAVER joined Justice BRICKLEY to further state that the lead opinion's finding with respect to the discrimination claims misapplies the governing law regarding the discrimination claims, and oversimplifies the facts of a complex case. Essentially, it allows a plaintiff to overcome summary disposition if the plaintiff can identify anyone who has less seniority, receives greater compensation, and does not share in the plaintiff's characteristics. Apparently, it is now irrelevant if the retained per-

son's job was different than that held by the plaintiff or if that person was qualified for the job. The lead opinion second-guesses the employer's decisions on the basis of its assumptions concerning which employee was more qualified.

Affirmed in part and reversed in part.

209 Mich App 179; 530 NW2d 135 (1995) affirmed in part and reversed in part.

*Bott & Spencer, P.C.* (by *Timothy J. Bott*), for the plaintiff.

*Varnum, Riddering, Schmidt & Howlett* (by *Joseph J. Vogan* and *Paul M. Kara*) for the defendants.

Riley, J. In the matter now before us, this Court is asked to clarify the evidentiary threshold a discharged employee must satisfy in order to create a genuine issue of material fact when an employer asserts that its decision to discharge an employee was precipitated by business conditions. We are also asked to decide whether a discharged employee may challenge an employer's decision to reduce its work force charging discrimination, even when the reduction in work force (RIF) decision has been deemed bona fide.

We hold that even when an employer's RIF decision is concluded to be bona fide, an employee may still establish a genuine issue of material fact that the employer's justification for discharging him was not the true reason for its decision to discharge. We also hold that in order for a discharged employee to establish a genuine issue of material fact when an employer contends that its decision to discharge the employee was based on a work-force reduction, the employee may not merely rely on unsubstantiated allegations or denials in the pleadings. Rather, he

must come forward with admissible evidence, affidavits, or other evidentiary materials, demonstrating the existence of a factual dispute that the employer's articulated reason was merely a pretext to discrimination.

In the instant case, we conclude that defendant's policy statement could have reasonably created a legitimate expectation of just-cause employment. We also conclude that defendant did have just cause to reduce its work force as a matter of law, but not with respect to this plaintiff. Rather, we hold that plaintiff did sufficiently establish a genuine issue of material fact regarding whether age was a determining factor in defendant's decision to discharge her. We also conclude that plaintiff presented evidence sufficient to establish a genuine issue of material fact regarding whether defendant considered her sex in its decision to discharge her.

We affirm the decision of the Court of Appeals finding that plaintiff could have reasonably had a legitimate expectation of just-cause employment. We also affirm its ruling that plaintiff raised a genuine issue of fact with respect to whether defendant discriminated against her on the basis of her age, as well as its decision concluding that plaintiff raised a genuine issue of material fact regarding her claim of sex discrimination.

### FACTS AND PROCEEDINGS

On January 29, 1973, plaintiff Nancy Lytle was hired by defendant Howmet Turbine Components

Corporation[1] as a general clerk in its human resources department, which at that time served all divisions making up the Whitehall operation. Plaintiff received a manual containing a statement of defendant's policies and procedures regarding employment. In the section containing defendant's policy regarding the relationship it sought with each of its employees, defendant expressed that a probationary period existed that afforded it time to decide whether it was in its interest as well as the employee's interest to continue the relationship following the probationary period. In that same section, the manual also stated that "[n]o employee will be terminated without proper cause or reason and not until management has made a careful review of all facts." The last two paragraphs of the manual stated:

> The contents of this booklet are not intended to establish, and should not be interpreted to constitute any contract between the Misco Whitehall Division, Product Support Operations, Reactive Metal Operations or the Technical Center of Howmet Turbine Components Corporation and any employee, or group of employees.
>
> For over twenty years we have concentrated on the production of the finest investment castings, with the development of policies and principles which aim at the attainment of pride in every day's work for every employee, *plus* the satisfaction of finding opportunities for individual growth and security. [Emphasis added.]

In 1981, defendant placed a disclaimer in its policy manual: "[T]he Company reserves the right to terminate employees without assigning cause; therefore,

---

[1] Defendant is a subsidiary of Pechiney, a government-owned French conglomerate. Headquartered in Delaware, Howmet has operated a facility in Whitehall, Michigan, since the early 1950s.

the employee serves at the will of the employer." *Direct notification of the disclaimer was provided only to new employees,* but plaintiff was involved in placing the disclaimer in new employee manuals.

At the time of plaintiff's hiring, John Ozar was the human resources director, serving as her immediate supervisor. Under Ozar's supervision, plaintiff received exemplary performance evaluations and was rewarded with a succession of promotions. In 1979, plaintiff spoke with Ozar about resigning and seeking employment elsewhere. Ozar assured plaintiff that her employment with defendant was secure and that she could expect advancement. Soon after that conversation, plaintiff was promoted to employment manager of the entire human resources department. Additionally, about the same time, Ozar hired Walter Boczkaja. Boczkaja became plaintiff's subordinate trainee. For approximately two years, Boczkaja trained under plaintiff, receiving promotions to various positions within the personnel department, and continued to be one of plaintiff's subordinates until 1989.

During the 1984-85 fiscal year, Ozar retired and was replaced by William Roof. In March 1987, Roof determined a need to decentralize the human resources department. He planned for each of the Whitehall divisions to have its own human resources representative. Roof hired defendant Michael Malady to head the Whitehall Machined Products Division and to serve as plaintiff's supervisor. Plaintiff was reassigned to serve as human resources representative for defendant's Ti-Ingot Division.[2]

---

[2] The Whitehall operation was composed of: the Misco Whitehall Division; the Product Support Operations, which includes the Machined Prod-

A personality conflict between Malady and plaintiff soon developed. In June 1987, Malady requested all female employees under his supervision to wear dresses to a company picnic. Plaintiff wore slacks. Shortly thereafter, in September 1987, Malady submitted an unfavorable evaluation of plaintiff's job performance.[3]

In January 1989, on Malady's recommendation and with Roof's approval, plaintiff's job title was changed from human resources representative to human resources specialist. Plaintiff's duties, as well as her salary, remained the same. Malady suggests that the change was necessary to reduce the number of direct reports he had to address, in addition to "centraliz[ing] the total employment function under one person instead of having it split with two different people doing part of it." He also asserts that he had "some performance concerns . . . with [plaintiff's] supervisory abilit[ies]," as reflected in his latest performance evaluation.

Plaintiff held her new position from January 1989, until her discharge on November 1, 1991.

Plaintiff contends defendant's policy manual created an expectation that her employment would not be terminated unless there was sufficient cause to do so. Also, she claims that she relied on verbal assurances by Ozar that her employment with defendant was secure.

---

ucts, Ceramic Products, and Thermotech Coating divisions; the Reactive Metal Operations, which includes the Ti-Cast and Ti-Ingot divisions; and the Technical Center, which includes the Data and Operhall Research divisions.

[3] Normal procedure was to submit evaluations regarding job performance each December for the previous twelve months.

Defendant argues that plaintiff was terminated pursuant to a company-wide reduction in work force. Defendant asserts that as a result of declines in military spending and a downturn in the commercial airline industry between 1988 and 1991, it was forced to institute a series of reductions in its work force. Defendant suggests that it initially sought to cut costs in the 1992 budget without terminating any employees. In an August 21, 1991, intracompany memorandum to all the personnel support departments,[4] Dr. Thomas Wright, vice president in charge of the Whitehall operations, directed all department supervisors to cut their respective 1992 budgets by fifteen percent.[5]

At the same time reductions were being sought, defendant was embarking on a plan that would use work cells as the primary facility structure, where employees would be working in teams instead of in the traditional hierarchical order. Notwithstanding the fact that he had to eliminate fifteen percent of his projected 1992 budget, Roof was told by the Operhall management to somehow compile a list of employees from the human resources department to head an independent department. From that list someone was to be selected to oversee the development of the work-cell plan.

After reviewing the qualifications of those listed, Operhall management identified Malady and Boczkaja as the two most promising candidates. Malady was not available and Boczkaja, who was interviewed by Operhall management, later decided to stay on in his

---

[4] Personnel support departments included: human resources, payroll, and accounts payable.

[5] At his deposition, Wright reflected on a more competitive and shrinking financial market that necessitated a need for the fifteen percent cut.

current position. Then Roof went to the private sector
and found Andrea Achterhoff.[6] She was thirty-one
years old and had previous experience as a produc-
tion supervisor, personnel manager, and human
resources manager. Plaintiff never was interviewed
for the position.

By November 1, 1991, in an effort to comply with
Wright's mandate, Roof had eliminated approximately
$300,000. Roof needed to cut $439,950 in costs in
order to meet Wright's directive of a fifteen-percent
reduction in expenditures for the human resources
department's 1992 operating budget. Roof eliminated
four positions in the human resources department,
which included two plant medical staff, the employee
assistance program assistant, and plaintiff's position
as human resources specialist. Roof contended that in
terminating these four individuals, he focused on
"functions" rather than "individuals or relative qualifi-
cations." He suggested that the decision was based on
who was absolutely critical and what they could get
by without. Roof claimed that he terminated plaintiff
because the primary function of her position involved
hourly employees, where a substantial portion of the
reduction in work force had already occurred, and
the fact that little, if any, hiring was forecasted in the
near future.

The same day plaintiff was discharged, defendant
hired Jeff Billingsley to work in the training program
for the work-cell project. As far as plaintiff under-
stood, Billingsley "worked for the corporate office"
and was merely assigned to take an office where

---

[6] Plaintiff admitted that she has limited knowledge of Achterhoff's aca-
demic and employment backgrounds.

plaintiff previously worked so that he would have a place to work. Moreover, plaintiff admitted that she had no idea how Whitehall's operation budget and personnel were allocated among all the Pechiney subsidiaries.

On November 22, 1991, Boczkaja completed a final performance evaluation on plaintiff, which Malady accepted, indicating that she would be rehired in the event a nonsupervisory, administrative position became available. When plaintiff was finally discharged, her duties were assigned to other persons within the human resources department.[7]

On January 7, 1992, plaintiff filed a complaint in the Muskegon Circuit Court against defendant Howmet, alleging: (I) breach of a contract providing for termination for just cause only, (II) age discrimination, and (III) sex discrimination.

Following some discovery, defendants Howmet and Malady moved separately for summary disposition pursuant to MCR 2.116(C)(10), which the circuit court granted on all counts.

The Court of Appeals reversed,[8] and this Court granted defendant's application for leave to appeal.[9]

---

[7] In sum, a total of ninety-one persons were terminated in 1991 at defendant's Whitehall operation, of which fifty-four were under the age of forty and sixty-eight were men.

[8] An additional count was filed against defendant Malady, alleging tortious interference with contractual relations. Malady's motion for summary disposition was granted and subsequently affirmed by the Court of Appeals. We leave that aspect of the Court of Appeals decision undisturbed.

[9] 451 Mich 920 (1996).

ANALYSIS

A motion for summary disposition under MCR 2.116(C)(10) tests whether there is factual support for a claim or defense. *Adkins v Thomas Solvent Co*, 440 Mich 293, 302; 487 NW2d 715 (1992); *General Motors Corp v Detroit*, 372 Mich 234, 239-240; 126 NW2d 108 (1964). The affidavits, pleadings, depositions, admissions, and other material supporting and opposing the motion must be considered,[10] so that it may be decided whether " 'it is impossible for the claim or defense to be supported at trial because of some deficiency which cannot be overcome.' " *Stevens v McLouth Steel Products Corp*, 433 Mich 365, 370; 446 NW2d 95 (1989), quoting *Rizzo v Kretschmer*, 389 Mich 363, 372; 207 NW2d 316 (1973).[11] If the court concludes that it is impossible for the record to be developed any further, summary disposition is appropriate. *Radtke v Everett*, 442 Mich 368, 374; 501 NW2d 155 (1993).

### I. JUST-CAUSE EMPLOYMENT

#### A

Employment contracts for an "indefinite" duration are presumed to be terminable at the will of either party, unless they contain distinguishing attributes or consideration in addition to the services to be rendered. *Lynas v Maxwell Farms*, 279 Mich 684, 687;

---

[10] The Court may not make actual findings or weigh the credibility of the evidence presented. *Featherly v Teledyne Industries, Inc*, 194 Mich App 352, 357; 486 NW2d 361 (1992).

[11] In accordance with MCR 2.116(G)(4), the nonmoving party may not rest on mere allegations or denials in the pleadings. *Durant v Stahlin*, 375 Mich 628, 639; 135 NW2d 392 (1965). If the nonmoving party is able to produce some evidence, all inferences and the benefit of any reasonable doubt must be made in his favor. *Id.* at 638.

273 NW 315 (1937). This presumption is founded on the fact that the parties technically possess complete freedom to contract before entering into the agreement. *Toussaint v Blue Cross & Blue Shield of Michigan*, 408 Mich 579, 600; 292 NW2d 880 (1980). It is not considered substantive in nature, but, rather, was judicially created to serve as a rule of construction in deducing the parties' intentions when no other indications exist:

> [T]he presumption provides assurance that oral contracts for an indefinite term, which fall outside the statute of frauds, will be recognized only where circumstances suggest both parties intended to be bound. [*Rowe v Montgomery Ward & Co, Inc*, 437 Mich 627, 636; 473 NW2d 268 (1991).]

The presumption of employment at will may be overcome by proof of "a contractual provision for a definite term of employment or a provision forbidding discharge absent just cause." *Rood v General Dynamics Corp*, 444 Mich 107, 117; 507 NW2d 591 (1993), citing *Rowe, supra* at 636-637. A contract for just-cause employment may be established in three ways. First, it may be formed by an "explicit" promise. *Rowe, supra* at 668 (BOYLE, J., concurring), citing Perritt, Employee Dismissal Law & Practice (2d ed), § 4.1, p 173. Second, it may be "manifested by the words or other conduct" of the parties assenting to the agreement. *Rood, supra* at 117, n 17. Third, it may be "implied by law" because the employer's statement regarding its "policies and procedures instill[ed] [a] 'legitimate expectation[]' of job security in [the]

employees." *Rood, supra* at 117-118, citing *Toussaint, supra* at 615.[12]

Under the third, when a policy manual is at issue, the court decides whether those sections that address employee discharge "are reasonably capable of being interpreted as promises of just-cause employment," that is, whether an ordinary individual, marked by reason and sensibility, viewing the objective manifestations of the parties' intent, could conclude that discharge would be only for just cause. *Rood, supra.*[13]

---

[12] The contract may be enforceable, although neither party signed the policy statement, because of the benefit that accrues to an employer when it establishes desirable personnel policies. *Toussaint, supra.* Hence, under *Toussaint,* written personnel policies are not enforceable because they have been "offered and accepted" as a unilateral contract; rather, their enforceability arises from the benefit the employer derives by establishing such policies. *In re Certified Question (Bankey v Storer Broadcasting Co),* 432 Mich 438, 453; 443 NW2d 112 (1989). See also *Toussaint, supra* at 613. In *Bankey, supra* at 453, this Court explained that when an employer establishes personnel policies in which it garners a benefit for the burden it has voluntarily accepted, the employer has then created a situation "instinct with an obligation." See also *Renny v Port Huron Hosp,* 427 Mich 415, 429; 398 NW2d 327 (1986).

[13] In *Rood, supra* at 140-141, we explained:

The common thread running through our decisions in *Toussaint* and *Renny is the presence of clear and specific employer policy statements, regarding employee discharge. Otherwise stated, the handbooks in both* Toussaint *and* Renny *contained statements reasonably capable of being interpreted as promises to discharge only for just cause.* Consistent with *Toussaint* and *Renny,* we therefore hold that, in all claims brought under the legitimate expectations theory of *Toussaint,* the trial court should examine employer policy statements, concerning employee discharge, if any, to determine, as a threshold matter, whether such policies are reasonably capable of being interpreted as promises of just-cause employment. If the employer policies are incapable of such interpretation, then the court should dismiss the plaintiff's complaint on defendant's motion for summary disposition. MCR 2.116(C)(10). If, however, the employer's policies relating to employee discharge are capable of two reasonable interpretations, the issue is for the jury. [Emphasis added.]

A just-cause obligation will not automatically arise where the manual lists conduct that constitutes a just basis for termination. In *Reid v Sears, Roebuck & Co*, 790 F2d 453, 460 (CA 6, 1986), quoting in part *Toussaint, supra* at 617, the United States Court of Appeals for the Sixth Circuit remarked:

> The fact that certain acts were identified as conduct that might lead to discharge did not indicate that these acts were the exclusive permissible grounds for discharge. Moreover, the Sears handbook had no language similar to that relied upon in *Toussaint*: "to treat employees leaving Blue Cross in a fair and consistent manner and to release employees for just cause only."

Any verbal assurances or statements of policy and procedure regarding job security must be clear and unequivocal to overcome the presumption of employment at will. *Rowe, supra* at 640-641, quoting *Bullock v Automobile Club of Michigan*, 432 Mich 472, 517; 444 NW2d 114 (1989), and Farnsworth, Contracts, § 7.10, p 492. To reach this threshold, "the statements must clearly permit a construction which supports the asserted meaning." *Rowe, supra* at 641.

In evaluating verbal expressions, the court considers "all the relevant circumstances surrounding the transaction, including all writings, oral statements, and other conduct by which the parties manifested their intent." *Id.*, citing Farnsworth, Contracts, § 7.10, p 492.

If the employer has manifested a just-cause policy, the employer may unilaterally change it to one of employment at will, regardless of whether such right was reserved by the employer from the outset:

> The very definition of "policy" negates a legitimate expectation of permanence . . . a "policy" is commonly understood to be a flexible framework for operational guidance, not a perpetually binding contractual obligation. In the modern economic climate, the operating policies of a business enterprise must be adaptable and responsive to change. [*In re Certified Question (Bankey v Storer Broadcasting Co)*, 432 Mich 438, 455-456; 443 NW2d 112 (1989).]

If the employer so chooses, then *reasonable notice must be given to all those affected.* "Reasonable notification is not necessarily actual notification";[14] rather, *the method instituted must be calculated in its objective of providing notice to those affected and not invoke the appearance of bad faith in its assurance of actually giving notice. In re Certified Question, supra* at 457 ("for the revocation of a discharge-for-cause policy to become legally effective, reasonable notice of the change must be uniformly given to affected employees").

B

Plaintiff makes two arguments. First, plaintiff argues that certain representations were made by management regarding job security. She claims that when she was called by another company about employment, Archer and Joseph Sheehan, the persons who originally hired her and Ozar, plaintiff's initial supervisor, told her that "they did not want [her] to leave . . . . You do a good job. You're very secure here. We'd like you to stay for long-term employment . . . ." She adds that individually, Ozar told her that "he would really like [her] to stay. [She] had a

_____

[14] *Grow v General Products, Inc*, 184 Mich App 379, 386; 457 NW2d 167 (1990).

very secure job at Howmet. [She] had a lot of potential," she would be missed, and he and Archer and Sheehan "hoped" she would decide to stay.

We conclude that these claimed assurances plaintiff received from Archer, Sheehan, and Ozar were not sufficiently " 'clear and unequivocal to overcome the presumption of employment at will,' " *Rood, supra* at 119, quoting *Rowe, supra* at 645, but, rather, represented that they "hoped" the employment relationship would "have a significant duration." *Rowe, supra* at 640, quoting *Carpenter v American Excelsior Co*, 650 F Supp 933, 936, n 6 (ED Mich, 1987) ("any orally grounded contractual obligation for permanent employment 'must be based on *more than* an expression of an optimistic hope of a long relationship' ") (emphasis previously supplied).

Second, plaintiff contends that she was told that the disclaimer[15] she helped affix in newly hired employees' policy manuals in 1981, applied only to new employees and that she "reasonably relied upon the written . . . statements and representations made by defendant[]" in its policy manual. When plaintiff was originally hired, the policy manual she received expressed that "[n]o employee will be terminated without proper cause or reason."[16]

This language, standing alone, instilled in plaintiff a legitimate expectation of just-cause employment.

---

[15] The disclaimer stated that "[t]he company reserves the right to terminate employees without assigning cause; therefore, the employee serves at the will of the employer."

[16] She also submits that as a result of her reliance, "there was by express words or operation of law, an agreement between the parties by which defendant Howmet was contractually obligated not to terminate [her] employment except for good cause."

However, the penultimate paragraph of the manual stated:

> The contents of this booklet are not intended to establish, and should not be interpreted to constitute any contract between the Misco Whitehall Division, Product Support Operations, Reactive Metal Operations or the Technical Center of Howmet Turbine Components Corporation and any employee, or group of employees.

We conclude that a question of fact exists regarding whether defendant's pre-1981 manual permitted plaintiff to have a legitimate expectation of just-cause employment. See *Rood, supra* at 140-141.[17] Defendant failed to clearly manifest an intent because of the contradictory language within the manual. The average employee may not have interpreted the penultimate paragraph to contradict the language of the just-cause provision. Furthermore, the penultimate paragraph specifically lists several divisions within defendant's Whitehall operation. Plaintiff's division, human resources, was not listed. See n 2. This alone could allow plaintiff to reasonably believe that the penultimate paragraph did not apply to her.[18]

---

[17] Justice Boyle contends that "plaintiff cannot have it both ways. Either the handbook applied to her employment relationship . . . or it did not apply to her . . . ." *Post*, p 53. A basic rule of contract law is that contradictory terms or meanings are construed against the drafter. In this case, the drafter was defendant. Hence, it is defendant, and not plaintiff as Justice Boyle contends, that "cannot have it both ways." Defendant cannot create security in its work force by expressing in its policy manual that its employees will be discharged only for cause and then express to its employees that they have no expectation of just-cause employment.

[18] Justice Boyle asserts that "the employer's relevant manifestations amounted to two separate representations." *Post*, p 58. We agree and conclude that defendant did not manifest a clear intent. Defendant left contradictory language in its policy manual. Hence, a question of fact exists regarding whether plaintiff had a legitimate expectation of just-cause employment. See *Rood, supra* at 138-141.

We conclude that the contradictory provisions are open to differing, but reasonable, interpretations. Thus, a question of fact exists regarding whether plaintiff had a legitimate expectation of just-cause employment.

Despite the contradictory provisions, defendant asserts that plaintiff had actual knowledge of the disclaimer she helped affix in newly hired employees' manuals in 1981, extinguishing any expectations she may have had regarding just-cause employment. We agree she had knowledge of the disclaimer. She worked in defendant's human resource department and helped place the disclaimer in handbooks to be given to new employees. Notwithstanding, it is undisputed that plaintiff did not receive a new handbook, nor was she told that the disclaimer applied to her. At the September 14, 1992, summary proceeding, the following exchange took place between the trial court and defense counsel:

*The Court*: Did [defendant] give any notice to [plaintiff]?

[*Defense Counsel*]: There was no direct notice to her in terms of a memorandum, but she was involved in the company putting the sticker in the book. . . .

*The Court*: Well, she didn't put it in her book, did she?

---

Justice BOYLE also contends, citing *Heurtebise v Reliable Business Computers, Inc*, 452 Mich 405; 550 NW2d 243 (1996), that "[a] conclusion that similar language does not protect a defendant from a just-cause claim would be logically inconsistent." *Post*, p 59. Again, we observe that Justice BOYLE fails to account for the contradictory language within defendant's policy manual. Furthermore, this Court's decision in *Heurtebise* does not apply because that case concerned the enforceability of an arbitration provision found in a manual containing a contractual disclaimer. Accordingly, *Heurtebise* does not control because plaintiff's claim relies on the legitimate expectation test under *Rood, supra* at 137-140. Moreover, in *Heurtebise, supra* at 414, the defendant clearly manifested its intent not to "be bound to any provision contained in the handbook."

*[Defense Counsel]*: Well, that's true.

Accordingly, because defendant could have easily provided notice to all those it intended to be affected by the disclaimer, we conclude that the method of notification instituted was not reasonably calculated to uniformly assure awareness of the change for all defendant's affected employees,[19] as well as hold that plaintiff's legitimate expectation of just-cause employment was left undisturbed.

## II. REDUCTION IN WORK FORCE

### A

A reduction in a work force for economic reasons constitutes termination for "just cause." *McCart v J Walter Thompson USA, Inc*, 437 Mich 109, 114; 469 NW2d 284 (1991), citing *Friske v Jasinski Builders, Inc*, 156 Mich App 468, 472; 402 NW2d 42 (1986).[20] In *Friske, supra* at 472, the Court of Appeals held:

> [D]ischarge for economic reasons, as determined by and within the complete discretion of the board of directors of defendant corporation, constitutes termination for sufficient cause. To hold otherwise would impose an unworkable economic burden upon employers to stay in business to the point of bankruptcy in order to satisfy employment contracts and related agreements terminable only for good or sufficient cause.[21]

---

[19] See *In re Certified Question, supra* at 457, *Grow,* n 14 *supra,* and accompanying text.

[20] See also *Bhogaonker v Metropolitan Hosp*, 164 Mich App 563, 564; 417 NW2d 501 (1987).

[21] If a plaintiff can prove "fraud, bad faith or subterfuge on the part of the board in its decision," the layoffs will not be bona fide. See *Friske, supra* at 472.

Layoffs that are conducted must be bona fide, that is, business conditions must have necessitated the reduction in work force. *McCart, supra* at 115. In *McCart*, the defendant sought summary disposition, contending that the plaintiff was discharged as part of a work-force reduction. Despite all the plaintiff's allegations regarding why he was wrongfully discharged, he "conceded" that the "defendant was instituting layoffs for economic reasons . . . ." *Id.* This Court concluded that "[i]n the absence of any sufficient response from [the] plaintiff, [the] defendant's proofs . . . were adequate to support summary disposition on the ground that [the] plaintiff's termination was for bona fide economic reasons." *Id.* at 116.

Therefore, where a defendant asserts work-force reduction in defense of its decision to discharge an employee, that employee, to establish a genuine issue of material fact that the employer's decision was not bona fide, may not merely rely on unsubstantiated allegations or denials in the pleadings, but, rather, must come forward with admissible evidence, affidavits, or other evidentiary materials, demonstrating the existence of a factual dispute.

Having set forth the controlling principles, we now turn to plaintiff's contention that defendant lacked just-cause to discharge her.

B

Plaintiff contests the genuineness of defendant's economic motivation in discharging her. Plaintiff claims that her review of defendant's corporate salary reports evidences that defendant had actually hired more people from 1988 to 1990. However, this docu-

mentation is not part of the record.[22] In spite of plaintiff's failure to present this evidence, it would be of no consequence because the evidence related to the period from 1988 through December 1990. Plaintiff was discharged on November 1, 1991. Defendant's decision to institute a work-force reduction was based on a forecasted economic decline in 1992. See n 5 and accompanying text.

In addition, plaintiff herself admits that defendant had been conducting an RIF from January 1988, until the time of her discharge, "as a method of dealing with [the] economic downturn . . . ." Notwithstanding, plaintiff submits that a Pechiney report called "Direct Magazine" published in May 1991, claimed sales figures for defendant corporation in the amount of $973 million, sales backlogs in excess of $1 billion, anticipated sales for 1991 of over $1 billion, as well as projected overall continued upward growth. We conclude, however, that defendant evidenced that Pechiney is a huge French-owned conglomerate. See n 1. Defendant could have overall profitability, yet require reductions in operating and capital expenditures in its subsidiaries.[23] Thus, our attention is

---

[22] By the September 14, 1992, hearing on defendant's motion for summary judgment, plaintiff had not presented this documentation.

[23] It is undisputed that defendant was conducting reductions in its work force elsewhere. In his deposition, Wright stated that not only was defendant conducting an RIF at its Whitehall facility division-wide, but it *was* also conducting "similar reductions . . . elsewhere in the Howmet organization." More particularly, Wright said:

In Tennessee in the past year, the employment had dropped from the neighborhood of 650 employees down to around 400. LaPorte recently had a rather major layoff. The exact number of people, I'm not sure, but I understand it was fairly large. In the meantime, we have also *closed a plant in Plymouth, Michigan, and moved that to Dover, New Jersey.*

directed at the economic disposition of defendant's Whitehall operation.[24]

Plaintiff also asserts that her testimony in a case brought against defendant involving another employee supports her contention. See n 24. But, her allegations are based solely on "information and belief" or inadmissible evidence, and, as such, even though we are required to view plaintiff's case in its most favorable light, we are given nothing to view that would permit us to conclude that the record before us could be developed at trial to the extent that it would leave open an issue on which reason-

---

*We closed Whitehall Machining here and moved that operation to Winstead, Connecticut, and we also recently closed the Reno, Nevada, plant and moved that operation to Whitehall.* I know that Dover's employment has dropped from the neighborhood of 1600 people a few years back to about 1100 people now. I know that our employment is down in the neighborhood, I think, around 2450 or somewhere in that neighborhood here in Whitehall from a high, I believe, of around 4100 a few years back. [Emphasis added.]

[24] On the basis of evidence presented in a similar case, *Krantz v Howmet Corp* (Circuit Court No. 90-26815-CK; Court of Appeals No. 159045), Justice CAVANAGH asserts that plaintiff could establish that defendant's RIF was not bona fide. We disagree. In *Krantz*, the plaintiff deposed expert Dr. William King. He testified against defendant Howmet. Dr. King stated that "the corporation Howmet located in Greenwich, Connecticut, has been showing increased net worth, increased retained earnings, and increased sales over the past five years . . . so . . . pleading that they have financial difficulties seems unreasonable." Nevertheless, on being asked whether "it [was] true that a business can be experiencing a decline in orders for its products and taking reasonably prudent business actions to reduce its work force so that the work force is in proportion to the work that it has," Dr. King answered "Yes."

Hence, Dr. King's testimony supports the conclusion that a company can have overall profitability and, yet, in order to maintain profitability, it may also need to reduce its work force. Even if Dr. King were to testify in this case, we are persuaded that his testimony would be of no consequence to invalidating defendant's company-wide RIF. Moreover, he would have an insurmountable burden in demonstrating that defendant's discharge of approximately fifty percent of its work force at its Whitehall operation was merely a pretext to discharging plaintiff.

able minds could differ. *Durant v Stahlin*, 375 Mich 628, 639; 135 NW2d 392 (1965); *Rizzo, supra* at 371.

Therefore, because we choose not to second-guess employers' decisions regarding day-to-day management operations,[25] and because plaintiff failed to present evidence demonstrating the existence of bad faith on behalf of defendant in its aim to reduce costs, we hold that defendant's decision to conduct a reduction in work force was proper as a matter of law.

C

We conclude that plaintiff's relief, if any, rests in the Civil Rights Act. See MCL 37.2202; MSA 3.548(202).[26]

In this instance, the Court of Appeals provided relief to plaintiff by concluding that defendant's decision to reduce its work force was a mere pretext to discrimination. It stated:

---

[25] This Court had long ago decided that courts should be reluctant to second-guess management in its day-to-day operations. See, e.g., *Dodge v Ford Motor Co*, 204 Mich 459, 507-508; 170 NW 668 (1919) (payment of dividends); *Nahikian v Mattingly*, 265 Mich 128; 251 NW 421 (1933) (fixing salaries of officers); *Barrows v J N Fauver Co*, 280 Mich 553, 558; 274 NW 325 (1937) (building plants and purchasing property); *Reed v Burton*, 344 Mich 126; 73 NW2d 333 (1955) (selling property); *Pettengill v Monteith Land Co*, 334 Mich 632; 55 NW2d 130 (1952) (entering into contracts); *Wayne Co Prosecuting Attorney v Nat'l Memorial Gardens, Inc*, 366 Mich 492, 496; 115 NW2d 312 (1962) (the business judgment rule "applies only to cases where there has been no fraud, misconduct, or abuse of discretion by the officers and directors").

[26] Even though an employer may have grounds to discharge an employee, it "may not decide which employees to lay off on the basis of considerations that are prohibited by law, such as race, gender, or age." See *Featherly*, n 10 *supra* at 355, citing *King v Michigan Consolidated Gas Co*, 177 Mich App 531; 442 NW2d 714 (1989), and *Schipani v Ford Motor Co*, 102 Mich App 606; 302 NW2d 307 (1981) ("Both cases taken together implicitly stand for the proposition that where an employer has a legitimate reason to terminate [e.g., economic necessity or a contract for employment at will], it may not do so for illegal reasons such as unlawful discrimination").

Bona fide economic reasons are just cause for discharge. *McCart* [*supra* at 114]. However, an employer may not use economic necessity as a pretext for unlawful discrimination. *Id.* at 115. When the parties dispute the genuineness of the economic necessity, the question of just cause is one for the trier of fact. *Ewers v Stroh Brewery Co*, 178 Mich App 371, 378-379; 443 NW2d 504 (1989). Here, plaintiff has presented documentary evidence that Howmet was not in an economic downturn during this period and that in reality its sales and net income were increasing and that it continued to hire personnel while it was discharging current employees. Giving the benefit of every reasonable doubt to plaintiff, we find that she has raised a genuine issue of material fact concerning whether Howmet's proffered economic justification was a mere pretext for discrimination, and this issue is best left to the jury to resolve. *McCart, supra* at 115-116; *Ewers, supra* at 373-374. [209 Mich App 179, 198-199; 530 NW2d 135 (1995).]

In so holding, the Court of Appeals erred by confusing just-cause analysis with discrimination analysis under the Civil Rights Act. It held that plaintiff's discharge constituted a breach of contract. *Id.* at 199.[27]

---

[27] The Court of Appeals incorrectly cites *McCart, supra,* for the proposition that "an employer may not use economic necessity as a pretext for unlawful discrimination." However, in *McCart, supra* at 115, we merely noted that "[t]he objective circumstances, as presented by defendant's proofs, indicate[d] no more than a termination resulting from an economically motivated work-force reduction." As such, we concluded that the plaintiff failed to present evidence sufficient to establish that the defendant's RIF was not bona fide. We stated that in order to establish an issue of fact, the plaintiff had to " 'establish that he has a case on the law and that there are some evidentiary proofs to support his allegations as to any material fact.' " *Id.,* quoting *Durant, supra* at 638. We continued by observing:

This case thus stands in marked contrast to . . . *Ewers* . . . , *where "plaintiff relied on deposition and documentary evidence which he argued indicated that defendant was experiencing substantial economic growth and operating at a substantial profit before and after his discharge." Id.* at 375. [*McCart, supra* at 115-116.]

However, defendant presented evidence of the economic necessity to conduct an RIF, e.g., a decline in military and commercial aircraft, as well as a more competitive market. See n 5 and accompanying text, and n 23. Therefore, we are persuaded that the Court of Appeals should have addressed plaintiff's claim in light of the Civil Rights Act, so that it could determine whether defendant relied on prohibited criteria in making its decision to discharge plaintiff.

Accordingly, we now turn to plaintiff's contention that she presented evidence establishing that, notwithstanding defendant's claim of economic necessity, its actual motive for discharging her was to discriminate against her on the basis of her age and sex.

### III. DISCRIMINATION

#### A. CIVIL RIGHTS ACT

The Civil Rights Act is codified in MCL 37.2202; MSA 3.548(202). In particular, subsection 202(1) provides, in pertinent part:

(1) An employer shall not do any of the following:

---

More particularly, in *Ewers, supra,* the plaintiff's evidence was overwhelming in demonstrating that the defendant's RIF was not bona fide. "[The] plaintiff showed a pattern of positive net earnings and increased dividends . . . [as well as] . . . an *increase* in the total salaried work force from 600 to approximately 2,100." *Id.* at 376. He "established that full bonuses were to be paid to participants in the incentive compensation plan based on the company's profitable performance . . . ." *Id.* He also presented evidence undercutting the defendant's assertion that the defendant's financial condition necessitated the discharge of plaintiff and others. *Id.* at 379. He showed that "[d]uring the same time period defendant bought Schaefer Brewery for $80,000,000 and Schlitz for $660,000,000." Further, he proved that "[t]he reduction in force was carried out with little or no advanced planning and with no study of its need or effect on the corporation . . . ." *Id.* at 376.

In this case, the Legislature has provided plaintiff recourse under the Civil Rights Act. MCL 37.2202; MSA 3.548(202).

(a) Fail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status.

Ever since our decision in *Matras v Amoco Oil Co*, 424 Mich 675, 683; 385 NW2d 586 (1986), we have looked to *McDonnell Douglas Corp v Green*, 411 US 792; 93 S Ct 1817; 36 L Ed 2d 668 (1973), and its progeny for guidance when addressing the Civil Rights Act.

In *McDonnell Douglas*, the Supreme Court promulgated a presumption-based approach that encompassed special rules governing the order of proof when a plaintiff attempts to establish his claim by circumstantial evidence. The *McDonnell Douglas* approach has been applied to other matters involving employee discharge as well as other types of disparate treatment cases, notwithstanding that *McDonnell Douglas* arose under the context of title VII of the Civil Rights Act, 42 USC 2000 *et seq*. Hence, this Court's analysis in *Matras, supra*, suggests that *McDonnell Douglas* applies to plaintiff's claims of discrimination based on sex as well as age.

The approach was not meant to be inflexible, but, rather, was developed to serve as "a *sensible*, orderly way *to evaluate the evidence in light of common experience* as it bears on the critical question of discrimination."[28] See *Adama v Doehler-Jarvis*, 115 Mich App 82, 95; 320 NW2d 298 (1982), citing *Loeb v Textron, Inc*, 600 F2d 1003, 1016-1017 (CA 1, 1979)

---

[28] *Furnco Construction Corp v Waters*, 438 US 567, 577; 98 S Ct 2943; 57 L Ed 2d 957 (1978).

(emphasis added). The underlying purpose in viewing
"the evidence in light of common experience" was set
forth by the Supreme Court in *Furnco Construction
Corp v Waters*, 438 US 567, 577; 98 S Ct 2943; 57 L Ed
2d 957 (1978):

> [W]e are willing to presume this largely because we know
> from our experience that more often than not people do not
> act in a totally arbitrary manner, without any underlying
> reasons, especially in a business setting. Thus, when all
> legitimate reasons for rejecting an applicant have been
> eliminated as possible reasons for the employer's actions, it
> is more likely than not the employer, who we generally
> assume acts only with some reason, based his decision on
> an impermissible consideration such as race.

Under the *McDonnell Douglas* approach, the bur-
den of persuasion always rests with the plaintiff to
prove that the prohibited discriminatory treatment by
the employer was a determining factor used in its
decision to discharge. *St Mary's Honor Center v
Hicks*, 509 US 502, 507; 113 S Ct 2742; 125 L Ed 2d
407 (1993), citing *Texas Dep't of Community Affairs
v Burdine*, 450 US 248, 253; 101 S Ct 1089; 67 L Ed 2d
207 (1981).[29] Thus, the plaintiff must prove that the
employer's explanation was a pretext to discrimina-
tion. The plaintiff can rely on the same evidence to
prove both pretext and discrimination as long as the
evidence would enable a reasonable factfinder to
infer that the employer's decision had a discrimina-
tory basis. *Udo v Tomes*, 54 F3d 9, 13 (CA 1, 1995).

The approach involves three stages. In the first
stage, the plaintiff must establish a prima facie case

---

[29] *La Montagne v American Convenience Products, Inc*, 750 F2d 1405,
1409 (CA 7, 1984) ("The defendant's burden is only one of production; the
burden of persuasion rests at all times on the plaintiff").

in order to create the rebuttable presumption of discrimination. The prima facie showing itself involves
four parts.[30] The plaintiff must show that (1) he was a
member of a protected class,[31] (2) he suffered an
adverse employment action, (3) he was qualified for
the position, and (4) others, similarly situated and
outside the protected class, were unaffected by the
employer's adverse conduct, suggesting that discrimination was a determining factor in defendant's
adverse conduct toward the plaintiff.

In the second stage, following the plaintiff establishing a prima facie case, the burden shifts to the
defendant-employer to articulate a legitimate, nondiscriminatory reason for its decision. *McDonnell Douglas, supra* at 802. If the employer is unable to satisfy
its burden of production, it is presumed that the basis
of the employer's decision was discriminatory. *Burdine, supra* at 253.

If the defendant rebuts the presumption, then, in
the third stage, the burden of production shifts back
to the plaintiff creating " 'a new level of specificity.' "
*United States Postal Service Bd of Governors v Aikens,* 460 US 711, 715; 103 S Ct 1478; 75 L Ed 2d 403
(1983), quoting *Burdine, supra* at 255; see also
*McDonnell Douglas, supra* at 802-805. At this point,
the plaintiff must establish that the employer's articu-

---

[30] *McDonnell Douglas, supra* at 802. See also, e.g., *Parnell v West,*
unpublished opinion, 1997 WL 271751 *2; 114 F3d 1188 (CA 6, 1997), citing
*Christopher v Stouder Memorial Hosp,* 936 F2d 870, 877 (CA 6, 1991);
*Robinson v Overseas Military Sales Corp,* 21 F3d 502, 508 (CA 2, 1994).

[31] Because the Civil Rights Act places no lower or upper limit on a
plaintiff's age, we conclude that this requirement is relative and must be
determined on a case-by-case basis in accordance with the dictates of this
opinion.

lation was merely a pretext to discrimination. *Id.* at 804; *Burdine, supra* at 256.[32]

## B. *ST MARY'S HONOR CENTER v HICKS*

Since the inception of the *McDonnell Douglas* approach, for the judiciary, "[f]inding a balance between protecting victims of subtle prejudice on the one hand, and overreaching into legitimate decision-making of business on the other," has proven itself a difficult task.[33] This is because in *McDonnell Douglas* the "[Supreme] Court did not . . . attempt to give any meaningful guidance as to how the specification of the required prima facie proof would be determined" for the third stage. Malamud, *The last minuet: Disparate treatment after* Hicks, 93 Mich L R 2229, 2245 (1995).

The Supreme Court's most recent attempt to provide guidance came in *Hicks*. In that case, the Court addressed whether a trier of fact may issue judgment as a matter of law in favor of a plaintiff when the plaintiff has proven that an employer's proffered reason for its employment action is false. In ruling that this alone is not adequate, the Court rewrote the third stage of the *McDonnell Douglas* approach. According

---

[32] The Circuit Court of Appeals for the First Circuit in *Woods v Friction Materials, Inc,* 30 F3d 255, 260 (CA 1, 1994), succinctly set forth the plaintiff's burden:

> To meet this burden, the [plaintiff] must prove *both* that the employer's articulated reason is false, and that discrimination was the actual reason for its employment action. See *Hicks, supra* at [511] n 4. If [the] plaintiff "fails to show 'pretext,' [for discrimination] the challenged employment action 'must stand.' " *Id.* at [516], n 6 (quoting *McDonnell Douglas, [supra]* at 807).

[33] See Essary, *The dismantling of* McDonnell Douglas v Green: *The high court muddies the evidentiary waters in circumstantial discrimination cases,* 21 Pepp L R 385, 386 (1994).

to the Court, once the employer rebuts the presumption, *McDonnell Douglas* is no longer relevant—having fulfilled its role of forcing the defendant to come forward with some response, the presumption "simply drops out of the picture." *Hicks, supra* at 511, quoting *Burdine, supra* at 255. After the defendant's rebuttal, "the trier of fact proceeds to decide the ultimate question: whether plaintiff has proven 'that the defendant [was] intentionally discriminated against . . .' because of his race . . . ." *Id.* Once the defendant satisfies its burden of production, the factfinder must then decide not whether that evidence is credible but " 'whether the rejection was discriminatory within the meaning of Title VII.' " *Hicks, supra* at 519. "It is not enough . . . to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." *Id.* Thus, the Court held, regarding the plaintiff's establishment of pretext, that "proving the employer's reason false *becomes part of (and often considerably assists)* the greater enterprise of proving that the real reason was intentional discrimination." *Hicks, supra* at 517 (emphasis added). The Court concluded that the factfinder's disbelief of the employer's proffered reasons, together with the elements of the prima facie case, might suffice to show intentional discrimination. *Hicks, supra* at 511.

Although the *Hicks* majority appeared to be unambiguous, "many readers have found it to be otherwise." 1 Lindemann & Grossman, Employment Discrimination Law (3d ed), p 24. Consequently, it is not surprising that

[s]ome employers have argued that, in order to defeat an
employer's motion for summary judgment, *Hicks* requires
plaintiffs to offer . . . *both* that the employer's articulated
reason was false and that the employer's true reason was
discriminatory—i.e., a "pretext-plus" standard. Some plain-
tiffs, on the other hand, have argued that once a prima facie
case of discrimination is put forward, summary judgment
for the employer *never* is appropriate, even if no evidence
is put forward to refute the employer's articulated nondis-
criminatory reason, because the factfinder's disbelief alone
should be enough to permit a finding of pretext. [*Id.*, p 25
(citation omitted; emphasis in original).]

However, the majority in *Hicks* rejected both
extremes. See *Equal Employment Opportunity
Comm v Yenkin-Majestic Paint Corp*, 1997 US App
LEXIS 4348. Instead, it favored an intermediate posi-
tion. See *Hicks*, *supra* at 510-511. The majority held
that "[e]ven though (as we say here) rejection of the
defendant's proffered reasons is enough at law to sus-
tain a finding of discrimination, *there must be a find-
ing of discrimination.*" *Id.* at 511, n 4. We, too, favor
such a position and hold that when viewed in a light
most favorable to the plaintiff, the evidence must cre-
ate a material issue of fact on which reasonable
minds could find that the employer's stated reason is
a pretext for discrimination for summary judgment to
be precluded. Furthermore, we hold that "evidence
sufficient to discredit a defendant's proffered nondis-
criminatory reasons for its actions, taken together
with the plaintiff's prima facie case, [may be] suffi-
cient to support [but not compel] a finding of discrim-

ination." *Combs v Plantation Patterns*, 106 F3d 1519, 1535 (CA 11, 1997).[34]

In other words, we expressly adopt the intermediate approach endorsed by the United States Supreme Court in *Hicks*. For a plaintiff to survive summary disposition, he must always present an issue of fact regarding whether the defendant impermissibly discriminated. In some contexts, this may be shown merely by disproving the employer's articulated reason, if, and only if, disproving the employer's reason also shows discrimination. See *Hicks*, *supra* at 511, 519. See also *Combs*, *supra* at 1535. In other contexts, merely disproving an employer's articulated reason will not prove discrimination. The bottom line is that there must always be evidence upon which reasonable minds could conclude that discrimination was the true motive for the decision. At summary proceedings, the evidence must always be taken in the light most favorable to the nonmoving party.

### C. *MATRAS v AMOCO OIL CO*

In *Matras*, the plaintiff was discharged as a result of the defendant's lay-off plan. In that case, we observed that "[a] jury c[ould] find that the discharge was 'because of age' even if age was not the sole factor":

---

[34] This is the law in the Second, Third, Fourth, Sixth, Seventh, Eighth, Ninth, Eleventh, and District of Columbia Circuits. See, e.g., *EEOC v Ethan Allen, Inc*, 44 F3d 116, 120 (CA 2, 1994), *Sheridan v EI DuPont de Nemours & Co*, 100 F3d 1061, 1066-1067 (CA 3, 1996) (en banc), *Mitchell v Data General Corp*, 12 F3d 1310, 1316 (CA 4, 1993), *Manzer v Diamond Shamrock Chemicals Co*, 29 F3d 1078, 1083 (CA 6, 1994), *Perdomo v Browner*, 67 F3d 140, 146 (CA 7, 1995), *Gaworski v ITT Commercial Finance Corp*, 17 F3d 1104, 1110 (CA 8, 1994), *Washington v Garrett*, 10 F3d 1421, 1433 (CA 9, 1993), *Combs*, *supra*, and *Barbour v Merrill*, 310 US App DC 419, 426; 48 F3d 1270 (1995).

Evidence that a competent older employee was termi-
nated and a younger employee was retained, is insufficient
standing alone to establish a prima facie case when the
employer reduces his work force because of economic
necessity. The rationale behind the *McDonnell Douglas*
formula is that its four-part test alone "eliminates the most
likely legitimate causes for the employer's adverse action."
This formulation is incomplete in the work-force-reduction
situation.

To establish a prima facie case of age discrimination
when an employer lays off employees for economic rea-
sons, the . . . employee [must] present sufficient evidence
on the ultimate question—whether age was a determining
factor in the decision to discharge the older protected
employee. Accordingly, in the instant case, the *McDonnell
Douglas* prima facie case approach folds into the traditional
directed verdict/judgment notwithstanding the verdict stan-
dard. [*Id.* at 684-685.]

We concluded that the *McDonnell Douglas*
approach folds into the traditional summary disposi-
tion or directed verdict standard because in the con-
text of an RIF we assume that the burdens of produc-
tion required by the respective parties under the
approach have already been met.[35] As a result,
because the burdens of production have been satis-
fied by the respective parties, all its presumptions
"drop out" and the plaintiff is left to prove that rea-
sonable persons could draw differing conclusions
regarding whether discrimination was the true moti-

---

[35] For example, when an employee is discharged because of an RIF, he
necessarily established a prima facie case, the first stage of *McDonnell
Douglas*: (1) he is in the protected class; (2) he suffered an adverse
employment action when he was let go by the company, (3) he was quali-
fied for the position because he had retained the position for many years,
and (4) younger employees who were similarly situated were retained.
Similarly, the employer necessarily met its burden of production, i.e., it let
the employee go because of a reduction in its work force.

vation underlying the employer's adverse action rather than an RIF.

Even though our decision in *Matras*, as well as the Supreme Court decisions in *McDonnell Douglas* and *Hicks* came after full trials, the principle is the same in summary proceedings:

> [O]nce the employer has advanced a legitimate, nondiscriminatory basis for its adverse employment decision, the plaintiff, before becoming entitled to bring the case before the trier of fact, must show evidence sufficient for the factfinder reasonably to conclude that the employer's decision to discharge him or her was wrongfully based on age. "Direct or indirect evidence of discriminatory motive *may do, but 'the evidence as a whole . . . must be sufficient for a reasonable factfinder to infer that the employer's decision was motivated by age animus.'* " Thus, the plaintiff cannot avert summary judgment if the record is devoid of adequate direct or circumstantial evidence of discriminatory animus on the part of the employer. [*Woods v Friction Materials, Inc*, 30 F3d 255, 260 (CA 1, 1994) (citations omitted, emphasis added).][36]

We recognize, however, in the context of an RIF, that merely showing someone similarly situated to the plaintiff who is outside the protected class will not be sufficient. In concluding so, we are guided by the decision of the Supreme Court in *O'Connor v Consolidated Coin Caterers Corp*, 517 US 308, 311-313; 116 S Ct 1307; 134 L Ed 2d 433 (1996). In *O'Connor*, the Court noted that a "substantially younger [person] than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff

---

[36] See also *LeBlanc v Great American Ins Co*, 6 F3d 836, 843 (CA 1, 1993).

was replaced by someone outside the protected class":

> As the very name "prima facie case" suggests, there must be at least a logical connection between each element of the prima facie case and the illegal discrimination for which it establishes a "legally mandatory, rebuttable presumption," *Burdine, supra* at 254, n 7. *The element of replacement by someone under 40 fails this requirement. The discrimination prohibited by the ADEA is* discrimination "because of [*an*] *individual's age,*" 29 USC 623(a)(1), though the prohibition is "limited to individuals who are at least 40 years of age," § 631(a). *This language does not ban discrimination against employees because they are aged 40 or older; it bans discrimination against employees because of their age,* but limits the protected class to those who are 40 or older.

> \*      \*      \*

> Because the [Civil Rights Act] prohibits discrimination on the basis of age and not class membership, the fact that a replacement is *substantially younger than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class.* [*Id.* at 311-313 (emphasis added).]

For these reasons, to survive a motion for summary disposition, once "the employer articulates a legitimate, non-discriminatory reason [for laying off the plaintiff,] . . . [t]he plaintiff *must* then introduce sufficient evidence to support two additional findings: (1) that the employer's articulated reason for [laying off the plaintiff] is a pretext, and (2) that the true reason is discriminatory." *Smith v Stratus Computer, Inc,* 40 F3d 11, 16 (CA 1, 1994).

Under some circumstances, however, as we previously observed, a plaintiff may not need to introduce additional evidence, aside from the evidence he

presented to support these findings in the first stage under *McDonnell Douglas*, because (1) the plaintiff's prima facie case may establish that the employer's articulated reason for its adverse employment action is a pretext and (2) in establishing that the articulated reason was pretext, the plaintiff may have created a question of fact regarding whether the true reason is discriminatory. In other words, under such circumstances, simply disproving the employer's articulated reason will suffice if, and only if, disproving the employer's reason also proves discrimination.[37] In other instances, however, simply disproving an employer's articulated reason will not establish discrimination, and, as such, the plaintiff would then have to introduce additional evidence, aside from that which had already been presented in the first two stages of the *McDonnell Douglas* approach, to support these two findings. We recognize that additional evidence may be necessary because a plaintiff *will not always present* "*a triable question of pretext simply because the plaintiff disputes the employer's stated reason(s)*; put differently, that there may be a triable question of *falsity* does not necessarily mean that there is a triable question of discrimination." Employment Discrimination Law, *supra*, p 26 (emphasis added and in original), citing, e.g., inter alia, *Udo, supra* at 13 ("to avoid summary judgment, the plaintiff [must prove both] that the employer's articulated reason . . . is a pretext, and . . . that

---

[37] In accord with the intermediate position we previously adopted, "evidence sufficient to discredit a defendant's proffered nondiscriminatory reasons for its actions, taken together with the plaintiff's prima facie case, [may be] sufficient to support [but not compel] a finding of discrimination," i.e., it may be sufficient to support the "two findings." *Combs, supra* at 1535.

the true reason is discriminatory"). Therefore, we
hold that in all actions involving claims of discrimina-
tion, there must always be evidence upon which rea-
sonable minds could conclude that discrimination
was the true motive for the employer's adverse con-
duct against the plaintiff.

### D. APPLICATION

We will assume that plaintiff established a prima
facie case under *McDonnell Douglas* because her
claim centers on defendant's assertion that it was
conducting an RIF. Accordingly, we must give the ben-
efit of every reasonable doubt to plaintiff and deter-
mine whether she might sufficiently develop the
record now before us to permit a jury to find that
defendant's proffered explanation as applied to her[38]
was a pretext to discrimination.[39]

As evidence of age discrimination, plaintiff notes
that it was only when Ozar retired and was replaced
by Malady that problems arose. Thus, for approxi-
mately the first thirteen years with defendant corpo-
ration it is undisputed that she excelled in her duties
as employment manager. We are unpersuaded that

_____

[38] In part II of this opinion, we held that defendant's RIF was bona fide.
However, as to plaintiff, we still must determine in her particular situation
whether defendant considered an unlawful discriminatory criterion in its
decision to discharge her.

[39] The dissent's analysis is fundamentally flawed because it consistently
fails to apply the well-accepted rule that the benefit of every reasonable
doubt must be given to the nonmoving party and the reviewing court only
is to determine whether the record might be developed that would leave
open an issue upon which reasonable minds could differ. *Skinner v
Square D Co*, 445 Mich 153, 162; 516 NW2d 475 (1994). The dissent also
consistently violates the principle that the reviewing court is not to make
findings of fact or weigh credibility in deciding a motion for summary dis-
position. See *Featherly*, n 10 *supra*; *Paul v US Mut Financial Corp*, 150
Mich App 773, 779; 389 NW2d 487 (1986), citing *Durant, supra*.

this permits an inference of discriminatory animus on the basis of age.

Aside from plaintiff's problems with Malady, it is undisputed that approximately six weeks before plaintiff's discharge, defendant hired Achterhoff for the new position created at defendant's Operhall Research Center. Achterhoff was a thirty-one-year-old woman who was paid ten thousand dollars more a year than plaintiff.[40] Conversely, plaintiff, who was forty-four years old at the time of her discharge, had nineteen years of experience in the human resources department.[41] Further, over those nineteen years, it is undisputed that she had been awarded a succession of promotions. Yet, in September before her formal discharge, defendant, while conducting an RIF, decided to hire Achterhoff and discharge plaintiff.[42] Furthermore, defendant's hiring of Achterhoff must be considered in light of the fact that plaintiff and

---

[40] The dissenting justices improperly analyze plaintiff's proofs by asserting that "Achterhoff took a newly created position," and, therefore, plaintiff failed to present evidence of age discrimination. *Post*, p 70. However, whether Achterhoff replaced plaintiff is of no consequence. Instead, our concern centers on whether others similarly situated to plaintiff were not affected by defendant's adverse employment action.

[41] Justice BOYLE notes that "with regard to the personnel decision itself, the decision to eliminate plaintiff's position was not made by Mr. Malady . . . ." *Post*, p 65. We disagree. Malady made the original adverse employment decision, i.e., his inexplicable evaluations led to plaintiff's demotion. Roof admitted that plaintiff was never considered for the position Achterhoff ultimately assumed. It was Roof who had to eliminate fifteen percent of his 1992 fiscal budget. It was Roof who decided to eliminate plaintiff's position, along with three other positions, i.e., two plant medical staff and the employee assistance program assistant.

[42] The dissent places great weight on the fact that plaintiff was not formally "terminated" until November. Still, the dissent admits that the decision to discharge plaintiff had already been made the previous September, the same time defendant corporation hired Achterhoff. Hence, that plaintiff was not formally released until the following November is of no consequence.

Achterhoff both "had very similar employment histories . . . [with] comparative qualifications."[43] *Post*, pp 71-72. Hence, if both had similar qualifications, the fact that Achterhoff received greater pay than that of plaintiff at a time defendant asserts it was conducting an RIF creates a question of fact regarding defendant's motive.

Plaintiff also evidenced defendant's inconsistency in its hiring Billingsley.[44] Roof testified that he discharged plaintiff to reduce the 1992 fiscal budget for the human resources department, yet it is undisputed that at least part of Billingsley's salary was paid out of that budget.[45] We note that plaintiff's proofs regarding Billingsley standing alone would present a rather weak case. Nevertheless, we consider it along with

---

[43] The dissent, quoting the United States District Court for the Southern District of Alabama in *Martin v Teledyne Brown Engineering*, 924 F Supp 1131, 1138, n 4 (SD Ala, 1996), concludes that "[t]he fact that Ms. Achterhoff's salary was not paid from the human resources department's budget is consistent with the employer's stated business reason . . . ." BRICKLEY, J., *post*, p 72, n 8. We disagree. Defendant stated that it eliminated plaintiff's position. Thus, Achterhoff's salary necessarily was going to be paid from a different budget. Given that "everything depends on the individual facts," *Woods v Friction Materials*, *supra* at 260, n 3, the record now before us persuades us to believe a genuine question of fact exists regarding whether defendant decided to discharge plaintiff on the basis of considerations that are prohibited by law.

[44] The dissent claims that we overlooked the fact that "Billingsley was only five years younger than the plaintiff." *Post*, p 73. Even though we conclude that in the instant case that this is not a clear indication of age discrimination, we cannot say that this "evidence of age differential is not relevant." *Matras*, *supra* at 708, n 10 (RILEY, J., dissenting). Each case must be decided on its own particular circumstances. *Id.* at 707 (RILEY, J., dissenting) quoting *McDonnell Douglas*, *supra* at 802. Further, the reviewing court must view all admissible evidence in a light most favorable to the nonmoving party. *Durant*, *supra*.

[45] The dissent argues that "[t]his type of personnel change is inherent in corporate restructuring and does not constitute evidence of discrimination." *Post*, p 74. We disagree if the true reason for the retention of one employee over another is discriminatory.

the other evidence she presented with respect to her age-discrimination claim.[46]

Plaintiff need not show that age was *the* determining factor in defendant's decision to discharge her. Rather, she need only prove that it was "*a* determining factor." (Emphasis added.) Therefore, we are persuaded that, despite defendant's claim that it based its decision on economic necessity, plaintiff produced evidence that would permit reasonable persons to conclude that age more likely than not was a determining factor in the adverse employment action defendant took against plaintiff. She presented proof that defendant hired individuals, Achterhoff and Billingsley, who were younger and, thus, along with the inconsistencies in defendant's proffered explanation, created a reliable indication that "but for" plaintiff's age, she would not have been discharged. See *O'Connor, supra.*

Thus, this case is distinguishable from *Matras, supra,* in which there was a lack of "evidence that management favored younger workers . . . , tended to fire older workers . . . , or suggested that older

---

[46] Justice BOYLE observes that "the statistical evidence established that between 1987 and 1992, the number of employees in Whitehall declined almost fifty percent, from 4,100 to 2,450, and the RIF resulted in termination of ninety-one employees in 1991, fifty-four of whom were under the age of forty and sixty-eight of whom were men." *Post,* p 65. We agree that defendant's RIF was bona fide with respect to it having just-cause to discharge plaintiff under her contract. However, "[e]ven though an employer may have grounds to discharge an employee, it may not proceed to unlawfully act against a particular employee." See *Featherly,* n 10 *supra.* Accordingly, merely because defendant's RIF was found to be bona fide, the Court must still determine whether plaintiff established that she was treated differently than "persons situated similarly" to her. *Smith, supra* at 16.

In this case, the record evidences that plaintiff was not situated similarly to all ninety-one employees.

workers were disfavored" and where the defendant employer's RIF was felt by workers of all ages. *Matras, supra* at 713 (RILEY, J., dissenting). Rather, here, defendant contends it discharged plaintiff out of economic necessity, but it then hired substantially younger persons at higher rates of pay with markedly less experience than that possessed by plaintiff, despite its claim that it was reducing its work force out of economic necessity. Plaintiff demonstrated the anomaly in defendant's assertion that it was conducting an RIF.[47]

Accordingly, this evidence suggests that defendant's reason for discharging plaintiff was only a pretext for favoring the younger hirees over the older plaintiff.[48] We are persuaded that plaintiff's proofs make it more likely than not that "[defendant's] proffered explanation [as applied to this plaintiff] is unworthy of

---

[47] Justice BOYLE asserts that "[c]ertainly, if Justice RILEY believed that the evidence produced by the plaintiff in *Matras [supra]*, was insufficient to show 'age was a determining factor in [the plaintiff's] discharge,' *id.* at 715 (RILEY, J., dissenting), the considerably weaker evidence in this case could not support a finding of discriminatory animus." *Post*, pp 65-66. We disagree. First, each case is factually different from the other and must be decided on the basis of its own particular circumstances. See *Matras, supra* at 707 (RILEY, J., dissenting), quoting *McDonnell Douglas, supra* at 802. Second, the evidence produced by the plaintiff in *Matras, supra,* was weaker, not stronger, than the evidence produced by plaintiff Lytle. For example, in *Matras, supra* at 713 (RILEY, J., dissenting), "[w]hat the record [did] show [was] that two younger people whose performance was rated the same as plaintiff's were also discharged." Accordingly, as compared to plaintiff Lytle, plaintiff Matras presented considerably weaker proof establishing that he was treated differently than others situated similarly to him.

[48] We must remember that the issue we now decide is not whether plaintiff was in fact discharged because of her age, that remains to be determined at trial. Instead, we only have to determine whether plaintiff's evidence would allow a jury to find that defendant's proffered explanation was a pretext to discrimination.

credence." *La Montagne v American Convenience
Products, Inc*, 750 F2d 1405, 1409 (CA 7, 1984).

As evidence of sex discrimination, plaintiff points
to her dealings with Malady. The Court of Appeals
agreed that this evidence was sufficient to raise "a
genuine issue of material fact with respect to a prima
facie case of gender discrimination, i.e., that she was
treated more harshly than similarly situated male
employees." *Id.* at 193.[49]

While we agree that these facts raise suspicion, we
are persuaded that the Court of Appeals erred by
exclusively focusing on the confrontations plaintiff
had with Malady. We conclude that it failed to prop-
erly determine whether defendant considered plain-
tiff's sex in its decision to discharge her. This is not to
say that plaintiff's confrontations with Malady are
irrelevant. Instead, these confrontations must be con-
sidered in light of the ultimate question—whether
plaintiff's sex was a determining factor in defendant's
decision to discharge her.

---

[49] The dissent questions why we ignore Achterhoff's hiring in our analy-
sis. The dissent itself ignores the fact that sex discrimination centers on
whether one sex has been treated differently than a similarly situated indi-
vidual from the opposite sex. Hence, because Achterhoff is female, we
briefly reference that she was the individual eventually hired for the new
human resources position at defendant Operhall Research Center.
Because Malady and Boczkaja are male, they are more significant to our
discussion. Roof testified that Malady and Boczkaja were the only ones
considered from a list he compiled of potential candidates for the posi-
tion. Moreover, in compiling the list, Roof admitted that plaintiff was not
even considered. Thus, when Malady and Boczkaja were selected as pos-
sible candidates by Operhall management, plaintiff's name was nowhere
to be found. Notwithstanding, the dissent contends that because "several
of [plaintiff's] former duties were assigned to female employees," that this
"is inconsistent with sex discrimination." *Post*, p 75. On the basis of the
dissent's reasoning, plaintiff could only establish her claim if defendant
corporation had discharged all its female employees. Such reasoning is
misplaced.

Hence, viewing the evidence in a light most favorable to plaintiff and drawing every reasonable inference in her best regard, we conclude that plaintiff created a genuine issue of material fact whether defendant considered her sex in its decision to discharge her. Plaintiff's confrontations with Malady were not isolated incidents. Before Roof's hiring of Malady in March 1987, plaintiff had a succession of promotions, culminating in her appointment to the position of "Employment Manager." When Roof became plaintiff's direct supervisor in 1985, because of Ozar's retirement, she continued to receive favorable employment evaluations, indicating that her performance was outstanding. Then, in March 1987, Roof hired Malady as his direct subordinate and plaintiff's supervisor. Plaintiff retained her job title as "Employment Manager," even though Malady only served as a supervisor of the Whitehall Machined Products Division. See n 2. In June 1987, defendant corporation's annual picnic was held. Before the picnic, Malady requested that all female employees in the human resources department wear dresses. Plaintiff, having attended the picnic in previous years, was aware of no company requirement that mandated that all female employees wear dresses. Accordingly, because she had never worn a dress in the past, and being unhappy with the inconvenience of being forced to wear a dress to an outdoor picnic, plaintiff wore slacks. Soon after the picnic, Malady inexplicably conducted a performance evaluation of plaintiff. He did so despite standard operating procedures for the human resources department, recognizing that performance evaluations were to be conducted in December of each calendar year as a precursor to

evaluations and decisions regarding merit pay raises, as well as promotions. Malady's negative evaluation of plaintiff was the first she ever received while employed by defendant corporation, i.e., from the time plaintiff was hired in 1973 until this evaluation, fourteen years, she had never received a negative performance appraisal. Other confrontations between Malady and plaintiff soon ensued,[50] which finally culminated with Boczkaja replacing plaintiff as employment manager and plaintiff being given the new title of human resources specialist. This is in light of the fact that Boczkaja was trained by plaintiff and had been her subordinate for the previous ten years.

Standing alone, we believe that plaintiff's confrontations with Malady do not create a question of fact regarding whether sex was a determining factor in defendant corporation's decision to discharge her. However, these facts must not be viewed in a vacuum, but, rather, in light of the other facts now before us. The same day plaintiff was discharged, defendant hired Billingsley to work in the training program for the work-cell project. Billingsley had worked several different jobs, mostly involving manufacturing, yet was promoted to manager of training. Moreover, Roof stated that Billingsley's new position was to be included in his budget, despite defendant's

---

[50] Plaintiff's responsibility as "Employment Manager" was to administer defendant corporation's affirmative action program. In September 1987, Malady, without conferring with plaintiff, made a hiring for a job opening that was to be filled by plaintiff from her affirmative action/EEO file. She confronted Malady by telling him that he was undermining her affirmative action responsibilities. When Malady did not respond, plaintiff went to Roof and complained. Roof issued a memorandum objecting to his interference with plaintiff's responsibilities. Shortly thereafter, Malady published another negative written evaluation of plaintiff's performance.

assertion that the human resources department had to reduce its budget by over $400,000 for the 1991 fiscal year. In light of defendant's contention that it was conducting an RIF, a reasonable trier of fact could conclude that its hiring of Billingsley, at a higher rate of pay, even though he had substantially less experience than that possessed by plaintiff, was merely a pretext to discrimination. It is uncontested that a portion of Billingsley's salary was paid out of the human resources department's budget.

Reinforcing the genuineness of plaintiff's claim is the fact that plaintiff was not considered fairly for the position Achterhoff ultimately assumed. Inexplicably, plaintiff, who was fully qualified and possessed substantially more experience than Boczkaja, who had been her subordinate at one time, was not even considered for the new position the management of defendant's Operhall Research Center sought to create.[51] In his deposition, Roof admitted that he never considered plaintiff for the new position, even though it included duties she could have assumed considering her nineteen years of experience at Howmet, as well as her "comparative qualifications" to those of Achterhoff, who *eventually* was hired.[52] Of course, we

[51] See, e.g., *Jameson v Arrow Co*, 75 F3d 1528, 1532-1533 (CA 11, 1996). Although the plaintiff in *Jameson*, applied for the position available before her discharge, it is clear plaintiff here wanted to be fairly considered for the position Achterhoff eventually assumed. Hence, "where a job for which the plaintiff is qualified, and for which the plaintiff applies, is available at the time of termination, and the employer offers the job to an individual outside the protected age group, an inference of intentional discrimination is [sometimes] permissible." *Id.* at 1532. It all depends on the particular facts before the reviewing court.

[52] Roof indicated that he was directed by Operhall management to compile a list of employees from the human resources department to head an independent department. From that list, someone was to be selected to oversee the development of defendant corporation's new work-cell proj-

are not ruling that the Civil Rights Act mandates that employers establish an interdepartmental transfer program during the course of an RIF. See *Jameson v Arrow Co*, 75 F3d 1528, 1532-1533 (CA 11, 1996).[53] Rather, we observe, in the face of the evidence presented by plaintiff, that it appears pretextual that defendant would only consider Boczkaja and defendant Malady as candidates for the new position and ultimately hire Achterhoff. Moreover, it appears pretextual that defendant would hire Billingsley over the more qualified plaintiff to assume responsibility regarding training and development for the "Whitehall training function."

Thus, the record as a whole suggests, in light of common experience, that a genuine issue of material fact exists regarding whether defendant's proffered explanation for discharging plaintiff was merely a pretext to age and sex discrimination.[54]

---

ect. After reviewing the qualifications of those listed, Operhall management identified Malady and Boczkaja as the two most promising candidates. Plaintiff's name never made the list. Because Malady was not available and Boczkaja decided to stay on in his current position, Roof went to the private sector and hired Achterhoff.

[53] Justice BOYLE states that "[g]iven the fact that Justice RILEY concluded in *Matras* that the civil rights laws were ' "not intended as a vehicle for judicial review of business decisions," ' *id.* at 715, I am unable to understand how she can find this plaintiff's evidence sufficient to survive summary disposition under the articulated standard." *Post*, p 66.

We agree that the civil rights laws were not " 'intended as a vehicle for judicial review of business decisions.' " *Id.* However, we also conclude that an employer "may not proceed to unlawfully act against a particular employee," although the employer may have been conducting a generally bona fide RIF. See *Featherly*, n 10 *supra*.

[54] Justice BOYLE herself concludes that "[s]tripped to its essentials, plaintiff's proofs, when viewed in a light most favorable to her, consist of evidence that she was replaced during a reduction in force by employees who were younger and possibly less qualified than she was." *Post*, p 67.

Justice BOYLE fails to appreciate her own conclusion. She agrees that plaintiff sustained her burden, yet concludes that summary disposition

CONCLUSION

In this case, we conclude that defendant's policy statement could have reasonably created a legitimate expectation of just-cause employment. However, defendant's reduction in work force was bona fide as a matter of law. Notwithstanding, we conclude that a genuine issue of material fact exists regarding whether age was a determining factor in defendant's decision to discharge plaintiff. Also, we conclude that a genuine issue of fact exists regarding whether defendant considered plaintiff's sex in its decision to terminate her.

Thus, we reverse the Court of Appeals decision holding that the trial court erred in summarily dismissing plaintiff's claim for breach of contract of just-cause employment. We affirm both the decision of the Court of Appeals concluding that plaintiff raised a genuine issue of material fact regarding whether defendant considered plaintiff's age as a determining factor in its decision to terminate her and its decision that a genuine issue exists regarding whether defendant considered plaintiff's sex in its decision to terminate her.

MALLETT, C.J., concurred with RILEY, J.

CAVANAGH, J. (*concurring in part and dissenting in part*). I agree with the lead opinion with respect to all sections except parts II(B) and II(C). Because discov-

---

was proper. Furthermore, her contention that the lead opinion "eschews any analysis of plaintiff's proofs regarding pretext in the context of the civil rights claim," is lacking. *Id.*, p 63. We find that her focus on "plaintiff's remaining proofs," is incorrect. *Id.* Instead, the issue before us involves whether a reasonable trier of fact may find for plaintiff upon examining all plaintiff's proofs, not merely "plaintiff's remaining proofs."

ery was not closed in this case and plaintiff established that a record might be developed that would preclude summary disposition, I respectfully dissent.

As to section II(B), the lead opinion claims that certain allegations plaintiff makes regarding whether defendant's RIF was bona fide are "not part of the record" or had not been presented by the date of the hearing on defendant's motion for summary disposition. See *ante* at 22. Furthermore, the lead opinion holds that plaintiff's "allegations are based solely on 'information and belief' or inadmissible evidence" and "we are given nothing to view that would permit us to conclude that the record before us could be developed at trial . . . ." *Id.* at 23.

I respectfully disagree. In a similar case against the same defendant, plaintiff was allowed to proceed to the jury regarding whether defendant's RIF was bona fide. In *Krantz v Howmet Corp* (Circuit Court No. 90-026815-CK; Court of Appeals No. 159045), defendant Howmet was sued under a wrongful discharge theory. Defendant maintained the same arguments and presented the same evidentiary material regarding the RIF as it has done here. However, plaintiff here has not had the same opportunity to present her evidence that the RIF was not bona fide.

Economic expert William King, Ph.D., provided key testimony in *Krantz* that, in his opinion, the RIF was not bona fide. However, before Dr. King had the opportunity to be deposed in this case, the court prematurely granted defendants' motion for summary disposition. Dr. King's discovery deposition was scheduled for October 10, 1992, but was canceled in conjunction with the trial court's decision on summary disposition, received by plaintiff on October 7,

1992. Ongoing discovery of defendant's experts was likewise scheduled for the same date. Furthermore, the parties stipulated to extend discovery.

It is premature for this Court to decide whether defendants' alleged RIF was bona fide because it is clear that discovery in this matter was not complete, and, as indicated by the jury verdict in plaintiff's favor in *Krantz*, it is certainly possible that a record may have been developed so that summary disposition for defendants should have been precluded. Therefore, I would remand this issue to the trial court for the completion of discovery so that plaintiff can have an equal opportunity to present evidence that defendants' alleged RIF was not bona fide.

I also respectfully dissent from portion II(C) of the lead opinion, which states that "the Court of Appeals erred by confusing just-cause analysis with discrimination analysis under the Civil Rights Act." *Ante* at 25. The Court of Appeals stated that "an employer may not use economic necessity as a pretext for unlawful discrimination. [*McCart v J Walter Thompson USA, Inc*, 437 Mich 109, 115; 469 NW2d 284 (1991).] When the parties dispute the genuineness of the economic necessity, the question of just cause is one for the trier of fact." 209 Mich App 179, 198; 530 NW2d 135 (1995).

In *McCart*, we stated that in order for a defendant to show that it discharged plaintiff for bona fide economic reasons, it must demonstrate two things: that "adverse business conditions existed *and* that the elimination of plaintiff's position was necessitated by those conditions." *Id.* at 115 (emphasis added). Therefore, where a plaintiff's proofs show that the elimination of his position was not motivated by the alleged

RIF, but rather by some other illegal reason, summary disposition should be precluded.

My position has been supported by two state supreme courts. In *Coelho v Posi-Seal Int'l, Inc*, 208 Conn 106, 122; 544 A2d 170 (1988), the Connecticut Supreme Court stated:

> We conclude that the question of whether an employer has terminated an employee because of a legitimate reduction in force or for other reasons is an issue to be determined by the trier of fact. An employer's contention that some employees were terminated as a result of a legitimate reduction in force does not necessarily establish that all employees were discharged for the same reason. *An employer may not use a reduction in force as a pretext to terminate other employees in violation of* contractual obligations, public policy *or statutory rights.* [Emphasis added.]

Further, in *Flanigan v Prudential Federal Savings & Loan Ass'n*, 221 Mont 419, 426; 720 P2d 257 (1986), the Montana Supreme Court held that it was a matter for the trier of fact to determine whether an employee had been terminated as a result of a legitimate reduction in force or because of other factors.

Therefore, even if under the lead opinion's reasoning that the RIF was bona fide, where plaintiff has presented sufficient facts to show that she was not fired because of a legitimate RIF, but, rather, she was fired because of other illegal reasons, her claim for wrongful discharge should go to the jury.

KELLY, J., concurred with CAVANAGH, J.

BOYLE, J. (*concurring in part and dissenting in part*). I write separately because I agree that plaintiff's wrongful-discharge claim fails, but disagree with

the lead opinion's rationale. I would not conclude, as does the lead opinion, that plaintiff had a legitimate expectation of just-cause employment on the basis of the statements in the handbook. The contractual disclaimer in the employee handbook belies this expectation, and there is no other record evidence sufficient to create a question of fact with regard to plaintiff's expectations of just-cause employment at the time she joined Howmet. With regard to plaintiff's employment discrimination claims, I concur with Justice RILEY's statement of the legal standard a plaintiff must meet in order to survive summary disposition, but I dissent from her result. Because plaintiff did not present evidence sufficient to raise a triable issue of fact that her position would not have been eliminated "but for" her age, *EEOC v Clay Printing Co*, 955 F2d 936, 940 (CA 4, 1992), I agree with Justice BRICKLEY that summary disposition for the defendant was appropriate.

I

The lead opinion concludes that plaintiff had a legitimate expectation of just-cause employment on the basis of a statement in the employee handbook, that stated, "No employee will be terminated without proper cause or reason and not until management has made a careful review of all facts." Absent any qualifying language, this language would be sufficient to raise a legitimate expectation that employees would not be terminated without good cause. However, in an equally conspicuous segment, the final page of the handbook stated:

> The contents of this booklet are not intended to establish, and should not be interpreted to constitute any con-

tract between the Misco Whitehall Division, Product Support Operations, Reactive Metal Operations or the Technical Center of Howmet Turbine Components Corporation and any employee, or group of employees.

The lead opinion apparently concludes that the disclaimer of contractual obligation was ineffective with respect to plaintiff because she was employed by Howmet in the human resources department, which is not specifically mentioned in the disclaimer. I disagree.

The handbook's title appeared on the cover substantially as follows:

YOUR FUTURE WITH HOWMET

MISCO WHITEHALL DIVISION
PRODUCT SUPPORT OPERATIONS
REACTIVE METAL OPERATIONS
TECHNICAL CENTER

These are the same divisions mentioned in the disclaimer. It is true that plaintiff's department is not specifically mentioned in the disclaimer. However, plaintiff's department is also not mentioned anywhere else in the handbook. In short, plaintiff cannot have it both ways. Either the handbook applied to her employment relationship, in which case the just-cause language and the disclaimer must be read together, or it did not apply to her because the handbook was only intended to apply to those divisions specifically mentioned on the cover and in the disclaimer. In the latter case, of course, plaintiff could not assert the handbook as evidence of a just-cause policy for

employees of the human resources department.[1]
Reading the handbook as a whole, I would conclude
that no reasonable jury could conclude that plaintiff
had a reasonable expectation of just-cause
employment.

A

Viewing the evidence in a light most favorable to
the plaintiff, plaintiff has not created a reasonable
question of fact that the handbook was intended to

---

[1] The lead opinion erroneously relies on the rule of contract analysis
that requires that ambiguous terms be construed against the drafter to
find a question of fact regarding legitimate expectation. *Ante* at 18, n 17.
The lead opinion thus unfortunately confuses the contract prong of *Tous-
saint v Blue Cross & Blue Shield of Michigan*, 408 Mich 579; 292 NW2d
880 (1980), with the pure legitimate-expectations public policy theory,
impermissibly fusing two approaches which this Court so long sought to
independently identify. In *Rood v General Dynamics Corp*, 444 Mich 107,
118; 507 NW2d 591 (1993), Chief Justice CAVANAGH observed that legiti-
mate-expectation analysis is not a contract analysis:

> In other words, there are two alternative theories of enforceabil-
> ity that may support a claim of wrongful discharge in Michigan.
> While the first theory is grounded solely on contract principles "rel-
> ative to the employment setting," *Rowe* [*v Montgomery Ward & Co,
> Inc*, 437 Mich 627, 632; 473 NW2d 268 (1991)], the second theory is
> grounded solely on public policy considerations. As Justice BOYLE
> noted in her concurring opinion in *In re Certified Question
> (Bankey v Storer Broadcasting Co)*, 432 Mich 438, 458; 443 NW2d
> 112 (1989), "the pure legitimate expectations leg of *Toussaint* was
> founded on the Court's common-law authority to recognize"
> enforceable obligations that arise " 'outside the operation of normal
> contract principles.' "

Whether a legitimate expectation arises is an equitable issue that
inquires into whether it is unjust to allow the defendant to deny the exis-
tence of just-cause employment. The issue is whether the language of the
handbook would permit reasonable jurors to find that the employer cre-
ated an expectation that employees would not be discharged except for
cause. By its own terms the handbook expressly stated that no binding
obligation was created by any statement therein. Thus, since the defend-
ant did not manifest a clear intent, the plaintiff could not have had a legit-
imate expectation on the basis of statements in the handbook.

apply only to the designated employees of one of the named divisions, as opposed to all employees of Howmet Turbine Components Corporation. Instead, plaintiff contends that the just-cause language applied to her employment, which could be viewed as existing outside the specified divisions. Under these circumstances, she cannot assert that one part of the handbook applies to her while another does not. Thus, on the basis of a careful review of the record, I would conclude that there is no factual basis for the claim that plaintiff's *department* is a separate division of the Howmet Corporation, rather than a department within the company intended to serve several of its divisions. I would therefore conclude that the handbook was intended to apply to all employees of Howmet Turbine Components Corporation who received it, including plaintiff.

The handbook's language indicates that it was intended to apply to plaintiff's employment relationship with her employer, just as it was intended to cover defendant's relationship with all employees to whom the handbook was distributed out of plaintiff's human resources department. On page 4 the handbook states:

> WELCOME!
> We are pleased to have you *with Howmet Turbine Components Corporation.* [Emphasis added.]

On page 5 the handbook states:

> OUR PLEDGE
> We believe *Howmet is a good place to work.* We pledge that we will honor the following principles in our relations with you . . . . [Emphasis added.]

On pages 15-19, the handbook discusses "Plant Poli-
cies and Procedures," with the following introduction:

> Throughout this handbook we have outlined *Howmet's*
> obligations to you and the methods by which *the Company*
> will fulfill these obligations. . . .
>
> There are *regulations which govern our conduct as
> employees while on Company property*, just as there are
> regulations governing us as citizens in the community in
> which we live or as members of clubs to which we
> belong. . . . [Emphasis added.]

Later, on page 24, the handbook states:

> *Your badge identifies you as an employee of Howmet*
> and serves as your pass in and out of the plant. It must be
> worn in a visible position at all times while you are on
> *Company property*. [Emphasis added.]

Finally, just before the contractual disclaimer on page
25, the handbook states:

> This handbook briefly outlines your privileges, benefits
> and responsibilities *as an employee of Howmet*. . . .
>
> It is not possible in any one booklet to list all the benefits
> and mutually helpful regulations, which come to or govern
> all types of employees. *If any portion of the information
> given is not completely clear to you, tell your foreman or
> supervisor what further information you want.* [Emphasis
> added.]

Throughout the handbook, the terms "Howmet,"
"the Company," and "Howmet Turbine Components
Corporation" are used interchangeably, indicating an
intent to describe Howmet's relationship with the
industry, its neighbors, and its employees, without
differentiating among the various divisions or depart-

ments.[2] Plaintiff provides no evidence that this was one handbook used for the employees in the specified divisions, while other similar handbooks applied to other divisions or departments. Rather, the fact that plaintiff's human resources department served several Howmet divisions located in Whitehall is uncontested.

B

I would conclude that the relevant statements in the handbook, the just-cause language and the disclaimer of contractual obligation, when read together, do not (1) "justify [an employee] in understanding that a commitment ha[d] been made," and (2) "instill[] a legitimate expectation of just cause employment . . . ." *Rood v General Dynamics Corp*, 444 Mich 107, 139; 507 NW2d 591 (1993). In *Rood* we stated, "[W]e need not reach the question whether a disclaimer of intent to create contractual liability contained in an employee handbook is sufficient to disclaim liability under the legitimate expectations theory of *Toussaint*." *Id.* at 142. See *Toussaint v Blue Cross & Blue Shield of Michigan*, 408 Mich 579; 292 NW2d 880 (1980). I would reach the question here and conclude that the disclaimer was effective to protect defendant from this type of liability.

---

[2] The handbook describes how Howmet relates to the industry at large, how its divisions are broken down, its relationship with the neighboring community, its equal opportunity/affirmative action program, and its policies and procedures as they relate to employees of Howmet. Nothing in the handbook indicates that terms apply to anything other than the corporation at large. Moreover, the handbook observes that the corporation was founded in 1950 in Whitehall, where plaintiff worked. I fail to understand how, when reading the handbook as a whole, the handbook or its various parts could be understood to apply to some employees and not to others. However, as noted above, if that were the case, plaintiff could not reasonably rely on one part of the handbook while ignoring another.

As we recognized in *Rood*, "[t]he first step in ana-
lyzing a legitimate expectations claim under *Tous-
saint*, is to determine, *what*, if anything, the employer
has promised." *Id.* at 138. There, we quoted the Sec-
ond Restatement of Contracts, § 2(1), for the proposi-
tion that "a '[p]romise [is] a manifestation of intention
to act or refrain from acting in *a specified way*, so
made as to justify a promisee in understanding that a
commitment has been made.'" *Rood* at 138-139. We
also observed that "not all policy statements will rise
to the level of a promise." *Id.* at 139. We continued:

> [W]e therefore hold that, in all claims brought under the
> legitimate expectations theory of *Toussaint*, the trial court
> should examine employer policy statements, concerning
> employee discharge, if any, to determine, as a threshold
> matter, whether such policies are reasonably capable of
> being interpreted as promises of just-cause employment. If
> the employer policies are incapable of such interpretation,
> then the court should dismiss . . . . If, however, the
> employer's policies relating to employee discharge are capa-
> ble of two reasonable interpretations, the issue is for the
> jury. [*Id.* at 140-141.]

In this case, the employer's relevant manifestations
amounted to two separate representations. One
demonstrated its termination policy; the other demon-
strated that it intended no expression of a binding
obligation to adhere to any stated policy. Thus, it can-
not be said that the employer's actions were sufficient
to justify an " 'understanding that a commitment ha[d]
been made.'"[3] *Id.* at 139. Moreover, although *Rood*

---

[3] Nor may it be said that a question of fact is created as to "what, if
anything, the employer has promised." *Rood* at 138. The unambiguous
expression of intent manifested by the defendant in the disclaimer of con-
tractual obligation was designed to prevent any statement in the hand-
book from being interpreted as a promise. The disclaimer of obligation

leaves the question of determining the meaning of policies capable of two reasonable interpretations to the jury, it does not authorize the jury to simply choose between two clear representations. Rather, under these circumstances, where the employer clearly manifests an intent to avoid being legally obligated by its handbook, the court should find that the absence of a promise compels the conclusion that the employer did not create "a situation 'instinct with an obligation.'" *Rood* at 138, n 30. The *Toussaint* legitimate-expectations approach, as an exception to the presumption of at-will employment, is an equitable approach to just-cause employment claims, which is rooted in public policy. Where the employer manifests a clear intent not to bind itself, however, the policy considerations in favor of binding the employer give way to its clearly manifested intent.

In *Heurtebise v Reliable Business Computers, Inc*, 452 Mich 405; 550 NW2d 243 (1996), we held that an arbitration clause in an employee handbook was unenforceable where the handbook also included a disclaimer of contractual intent. A conclusion that similar language does not protect a defendant from a just-cause claim would be logically inconsistent. In *Edwards v Whirlpool Corp*, 678 F Supp 1284, 1291 (WD Mich, 1987), relying on *Dell v Montgomery Ward & Co, Inc*, 811 F2d 970 (CA 6, 1987) (holding that a disclaimer of contractual intent and reservation of right to terminate at will is sufficient to overcome

---

does not contradict the termination policy any more than it contradicts any other policy statement in the handbook. Rather, it *limits* the statements in the handbook by expressly providing that no employee may reasonably interpret them as binding on the employer.

just-cause termination language in the employee manual), the federal district court explained:

> The *Toussaint* holding created an exception to the general rule that employment relationships are terminable at the will of either party . . . . The Michigan Supreme Court suggested that a company could protect itself from liability by expressly disclaiming its intent to create anything but an at-will employment relationship. It did not find, however, that a company creates a just cause contract if it issues an employee handbook without including the magical phrase that the employment relationship remains an "at will" relationship. In this case, I find that defendant adequately protected itself by stating that it did not intend for the employee handbook to create a contract of employment.

Additionally, in *Rowe v Montgomery Ward & Co, Inc*, 437 Mich 627, 649-650; 473 NW2d 268 (1991), this Court approved the reasoning offered by the United States Court of Appeals for the Sixth Circuit in *Dell*, while holding that a reservation of at-will termination is sufficient to defeat any language that might give rise to an expectation of just-cause termination. In *Dell*, the employer disclaimed contractual intent regarding a progressive discipline process, stating that "[t]his procedure does not form an employment contract." *Id.* at 972. The employer's clear disclaimer of contractual intent here, as in *Edwards* and *Dell*, was sufficient to defeat any expectation of just-cause termination arising out of other language in the handbook.

In *In re Certified Question (Bankey v Storer Broadcasting Co)*, 432 Mich 438, 441; 443 NW2d 112 (1989), "this Court held that a company's written policy statements, which created legitimate expectations in the employee of discharge for cause only, could be

unilaterally modified by the employer." *Rowe* at 647-648. Such change is subject only to the requirement "that the employer gives affected employees reasonable notice of the policy change." *In re Certified Question* at 441. *Certified Question* thus endorsed the proposition that an employer could prospectively limit its liability by expressly disclaiming contractual intent with regard to the policies and procedures outlined in its employment manual or handbook. Such a disclaimer is consistent with the policy based doctrine preventing an employer from disavowing the creation of "promises" instinct with obligation, because it provides the employees with actual notice of the employer's clear intent not to obligate itself by the policies outlined in the manual in the same manner as the employees are notified of everything else in the manual. Under the instant circumstances, the employee cannot contend as a matter of law that she has a legitimate expectation that the employer should not be allowed to disavow.

Thus, I would conclude plaintiff is not entitled to assert a legitimate expectation of just-cause employment where the handbook on which she relies disclaims any intent on the part of the employer to bind itself to the contents of the handbook. In conjunction with the disclaimer of contractual obligation, the policy language is insufficient to overcome the presumption of at-will termination. Finally, I note again that if the disclaimer were found to be inapplicable because it does not expressly mention plaintiff's department, then the entire handbook must be found inapplicable for the same reason.[4]

---

[4] I also disagree with the lead opinion's treatment of the defendant's

II

I concur with part III of Justice Riley's opinion to the extent that she adopts the "intermediate position" set forth in *St Mary's Honor Center v Hicks*, 509 US 502, 510-511; 113 S Ct 2742; 125 L Ed 2d 407 (1993), and explained in the excerpts she references from 1 Lindemann & Grossman, Employment Discrimination (3d ed), *ante* at 30-33. I also concur with Justice Brickley's analysis of the civil rights claims. As noted by Justice Riley, the intermediate position we adopt today is the majority rule in the circuit courts of appeal. In *Hicks*, the Court stated:

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination, and the Court of Appeals was correct when it noted that, upon such rejection, "[n]o additional proof of discrimination is *required*" . . . . [*Id.* at 511.]

I understand this language, especially the reference to "suspicion of mendacity," and its application by both Justice Riley and Justice Brickley, to refer to the

---

claim that the plaintiff's position was eliminated as part of a general reduction, insofar as it relates to the just-cause claim. We have not decided that a defendant must demonstrate economic reasons not only for the elimination of a just-cause employee position, but also for the termination of a plaintiff as an individual. *McCart v J Walter Thompson USA, Inc*, 437 Mich 109, 116; 469 NW2d 284 (1991).

Assuming arguendo the plaintiff had a legitimate expectation that she would be discharged only for cause, in my view the proofs were insufficient to permit a rational juror to conclude that the defendant's proffered reason for the discharge was false. Therefore, if I were to reach the issue, I would concur with the lead opinion.

*probative strength* of the inference that a reasonable mind could draw from the proffered proof. As noted by Justice RILEY, "[U]nder such circumstances, simply disproving the employer's articulated reason will suffice if, and only if, disproving the employer's reason also proves discrimination." *Ante* at 37.[5] Thus, in following the United States Supreme Court and the federal circuit courts in the area of employment discrimination, we apply the standard for summary disposition of *Anderson v Liberty Lobby, Inc*, 477 US 242; 106 S Ct 2505; 91 L Ed 2d 202 (1986). *Skinner v Square D Co*, 445 Mich 153, 178; 516 NW2d 475 (1994) (LEVIN, J., dissenting).

While I generally concur with Justice RILEY's statement of the law, I dissent from her application of the law in this case. For unknown reasons, her opinion eschews any analysis of plaintiff's proofs regarding pretext in the context of the civil rights claim. *Ante* at 28. The plaintiff's evidence rebutting defendant's presentation of its reasons for eliminating plaintiff's position was the overall profitability of the parent organization. As the majority recognizes, it was insufficient, standing alone, to raise a triable issue of falsity. At this point in the analysis, the question becomes whether a reasonable trier of fact could find from plaintiff's remaining proofs that, more likely than not, plaintiff's age or gender was a reason for the elimination of her position, i.e., that defendant's reduction in force was a pretext for discrimination.

---

[5] Although Justice RILEY states that Justice BRICKLEY's evaluation of the evidence "violates the principle that the reviewing court is not to . . . weigh credibility in deciding a motion for summary disposition," *ante* at 38, n 39, I believe the intermediate approach adopted today requires the court, in employment discrimination cases, to fairly inquire into the sufficiency of the evidence, i.e., its probative strength.

In *Smith v Stratus Computer, Inc*, 40 F3d 11, 17 (CA 1, 1994), a gender discrimination case, the court found the plaintiff's evidence of discriminatory animus inadequate to prove disparate treatment. The court aptly noted that "the plaintiff has the burden of showing that she was treated differently from 'persons situated similarly "in all relevant aspects." ' " *Id.* The court observed that in order "to compare [the plaintiff's] treatment with that of terminated or transferred male executives in a meaningful way, [the plaintiff] would have to show that she was similarly situated to those men in terms of performance, qualifications and conduct, 'without such differentiality or mitigating circumstances that would distinguish' their situations." *Id.* The court also observed that "[t]he biases of one who neither makes nor influences the challenged personnel decision are not probative in an employment discrimination case." *Id.* at 18. As in *Smith*, the plaintiff here has "utterly failed" to produce sufficient evidence.

Plaintiff's proofs consisted at best of equivocal evidence that she was more qualified than younger persons who were paid from different budgets. While an employer may not hide behind a termination by parceling out plaintiff's jobs, there is no dispute that defendant engaged in a work force reduction. Although some of plaintiff's duties were reassigned among other employees, the younger persons she points to also performed some different tasks from those involved in the eliminated position. Some of plaintiff's duties appear to have been assigned to persons other than those she references as evidence of discrimination, and some of plaintiff's duties, for example, hourly training, appear to have been elimi-

nated altogether. Additionally, plaintiff has not shown
that her qualifications were really similar to those of
the other employees. As noted by Justice BRICKLEY, for
example, "Ms. Achterhoff received a degree in a
human resources related field [while] [t]he plaintiff
had no such degree . . . ." *Post* at 71. Moreover, the
statistical evidence established that between 1987 and
1992, the number of employees in Whitehall declined
almost fifty percent, from 4,100 to 2,450, and the RIF
resulted in termination of ninety-one employees in
1991, fifty-four of whom were under the age of forty
and sixty-eight of whom were men.[6] Finally, with
regard to the personnel decision itself, the decision to
eliminate plaintiff's position was not made by Mr.
Malady, the alleged source of gender bias. Mr. Roof,
who made the decision, is ten years older than plain-
tiff. Roof did not make the decisions to hire Achter-
hoff and Billingsley, or to promote Boczkaja. Thus,
the evidence is too disjointed to warrant an inference
that discriminatory animus, rather than economic fac-
tors, caused the elimination of plaintiff's position. In
light of these facts, I agree with Justice BRICKLEY that
plaintiff's evidence "is irrelevant to Ms. Lytle's termi-
nation and does not present evidence of dis-
crimina[tion] . . . ." *Id.* at 73.

Certainly, if Justice RILEY believed that the evidence
produced by the plaintiff in *Matras v Amoco Oil Co*,
424 Mich 675; 385 NW2d 586 (1986), was insufficient
to show "age was a determining factor in [the plain-
tiff's] discharge," *id.* at 715 (RILEY, J., dissenting), the

---

[6] This evidence not only establishes that defendant's RIF was bona fide
with regard to the plaintiff's just-cause claim, but also considerably weak-
ens the probative strength of the evidence plaintiff claims would establish
discriminatory animus.

considerably weaker evidence in this case could not support a finding of discriminatory animus. There, the plaintiff was originally referred to as "an 'aggressive young man,'" but years later was nicknamed "Gramps" and given "an unwanted party . . . to celebrate [his] fortieth birthday . . . ." *Id.* at 680-681. When the plaintiff was discharged as a part of an RIF shortly after his forty-first birthday, he sued Amoco for age discrimination, alleging that Amoco's termination plan divided employees by age, that he was told he was "low man in the over age 40 group," that younger persons replaced him, and that "age discrimination was designed into the evaluation process . . . ." *Id.* at 713. Viewing this evidence in a light most favorable to the plaintiff, Justice Riley was unable to conclude that the plaintiff had produced evidence of discriminatory animus.

I fail to understand how plaintiff's evidence here shows discriminatory animus. Rather, because the evidence of the RIF proves "the discharge . . . would have taken place without regard to age [or gender] discrimination, age [and gender were] not . . . determining factor[s] in [plaintiff's] discharge." *Matras* at 691. Given the fact that Justice Riley concluded in *Matras* that the civil rights laws were "'not intended as a vehicle for judicial review of business decisions,'" *id.* at 715, I am unable to understand how she can find this plaintiff's evidence sufficient to survive summary disposition under the articulated standard. In short, plaintiff's evidence does not create "a genuine dispute about [defendant's] intent or motive . . . sufficient . . . to permit a jury to find that the defendant's proffered reason [the RIF] is

merely a pretext for intentional discrimination."
*Krenik v Le Sueur Co*, 47 F3d 953, 959 (CA 8, 1995).

If the plaintiff chooses to rebut defendant's offer of
a legitimate business reason with evidence of falsity,
she must do more than create a triable question of
falsity. Stripped to its essentials, plaintiff's proofs,
when viewed in a light most favorable to her, consist
of evidence that she was replaced during a reduction
in force by employees who were younger and possi-
bly less qualified than she was.[7] The proofs raise no
suspicion of mendacity and are not sufficient to sur-
vive summary disposition. Therefore, I dissent from
the lead opinion's result and would conclude that
summary disposition was proper on all counts.

WEAVER, J., concurred with BOYLE, J.

BRICKLEY, J. (*concurring in part and dissenting in
part*).

### I. WRONGFUL TERMINATION

I agree with the lead opinion's resolution of the
plaintiff's wrongful termination claim. The plaintiff
created a question of fact whether she was a just-
cause employee because she had a legitimate expec-
tation of just-cause employment under *Rood v Gen-
eral Dynamics Corp*, 444 Mich 107; 507 NW2d 591
(1993). However, the plaintiff failed to raise a ques-
tion of material fact that the defendant had just cause

---

[7] While such evidence might be enough to raise the prima facie ele-
ments under *McDonnell Douglas Corp v Green*, 411 US 792; 93 S Ct 1817;
36 L Ed 2d 668 (1973), in the presence of defendant's legitimate nondis-
criminatory defense, the RIF, such evidence does not raise a question of
fact with regard to discriminatory animus.

to terminate the plaintiff as part of its reduction in force.

## II. DISCRIMINATION

I am unable to agree with the lead opinion's disposition of the plaintiff's claims of age and sex discrimination. As an initial matter, I do agree with the lead opinion's adoption of the intermediate approach. *Ante* at 32-33. I also agree that " '[t]he plaintiff *must* then introduce sufficient evidence to support two additional findings: (1) that the employer's articulated reason for [laying off the plaintiff] is a pretext, and (2) that the true reason is discriminatory.' *Smith v Stratus Computer, Inc*, 40 F3d 11, 16 (CA 1, 1994)." *Ante* at 36.

Though I agree with the lead opinion's statement of the law, I disagree with its application of the law to the facts of this case. The lead opinion finds that the plaintiff presented sufficient evidence of both age and sex discrimination to survive the defendant's summary disposition motion. Although I agree with the lead opinion's conclusion that this plaintiff has stated a prima facie case, she has offered little evidence which shows that the defendant's proffered business reason is false. Rather, she must rely on her evidence of the prima facie elements to prove that the defendant's proffered reason was a pretext for discrimination. I would find that this evidence was not enough to survive the motion.[1]

---

[1] The lead opinion asserts that I have improperly engaged in fact finding and credibility determinations. *Ante* at 38, n 39. However, a court must consider "affidavits, together with the pleadings, depositions, admissions, and documentary evidence" when examining a motion made under MCR 2.116(C)(10). MCR 2.116(G)(5). Citing unrefuted deposition testimony does not constitute an impermissible credibility determination.

## A. AGE DISCRIMINATION

The lead opinion bases its holding on findings that the defendant hired two "substantially younger persons," Ms. Achterhoff and Mr. Billingsley, at higher rates of pay at the same time that it terminated plaintiff. *Ante* at 42. The lead opinion concludes that this "anomaly in defendant's assertion that it was conducting an RIF" provided sufficient evidence that the plaintiff was terminated as a result of age discrimination. *Id.* However, this finding greatly oversimplifies the facts and ignores the defendant's evidence.

As the lead opinion points out, the plaintiff has stated a prima facie case, and the defendant has met its burden of production by stating a nondiscriminatory business reason for the plaintiff's termination. Thus, all presumptions have "dropp[ed] out of the picture." *St Mary's Honor Center v Hicks*, 509 US 502, 511; 113 S Ct 2742; 125 L Ed 2d 407 (1993). At this point, the plaintiff must show discrimination in one of two ways. First, she may offer direct or circumstantial evidence showing that the defendant was motivated by discriminatory animus. If persuasive, this will show that the employer's real reason was discrimination, thus disproving the proffered nondiscriminatory reason. Second, the plaintiff may also meet this burden by presenting evidence of falsity sufficient to show that the employer possessed a discriminatory intent. 1 Lindemann & Grossman, Employment Discrimination Law (3d ed), pp 26-27. However, because this defendant has stated a nondiscriminatory business justification for its actions, the plaintiff will only survive summary disposition if there is sufficient evidence to create a question of material fact that the defendant acted out of a discriminatory

intent. At this point, the analysis is identical to the federal standard for summary judgment. *Anderson v Liberty Lobby, Inc*, 477 US 242; 106 S Ct 2505; 91 L Ed 2d 202 (1986).

### 1) THE HIRING OF ANDREA ACHTERHOFF

The hiring of Ms. Achterhoff does not provide evidence of age discrimination. Indeed, it is irrelevant for several reasons. First, Ms. Achterhoff took a newly created position as human resources representative for the Operhall Research Center.[2] Indeed, Ms. Achterhoff was hired six to eight weeks before the plaintiff was terminated.[3] Thus, the plaintiff's claims amount to an assertion that she should have been given Ms. Achterhoff's position rather than being laid off. However, civil rights laws do not require an employer to retain older workers during a reduction in force at the expense of younger employees with less seniority.[4] *Barnes v GenCorp, Inc*, 896 F2d 1457, 1471 (CA 6, 1990) ("An employer is free to retain the younger, less senior employee if the employer reasonably believes he or she is better qualified for the position"). The retention of younger employees during a

---

[2] The plaintiff has failed to offer any evidence that this position was created as a pretext for her termination. Rather, it is undisputed that the position was created to serve legitimate business purposes.

[3] Though there was testimony that the decision to terminate plaintiff had been made in September, plaintiff was not terminated until November.

[4] Indeed, had the plaintiff been given Ms. Achterhoff's job because of her age, Ms. Achterhoff would have been entitled to sue because Michigan's anti-age discrimination laws do not define a protected class as does federal law. Once Ms. Achterhoff was hired, the defendant was required to make its decision on the basis of neutral criteria. Mr. Roof testified at length that the decision was based on the decreased need for the position held by the plaintiff. The plaintiff fails to offer any evidence that rebuts this analysis.

reduction in force is not evidence of discrimination. *Matras v Amoco Oil Co*, 424 Mich 675, 688; 385 NW2d 586 (1986). Thus, the hiring of Ms. Achterhoff does not show any evidence of discriminatory animus.

Second, crucial decisions regarding the hiring of Ms. Achterhoff were made by people other than those who terminated the plaintiff. The plaintiff does not contest Mr. Roof's narration of the events surrounding this decision. Accordingly, it is undisputed that Operhall was not interested in any of the human resources staff, save Mr. Malady and Mr. Boczkaja. Thus, the decision not to consider Ms. Lytle for this position was made by individuals at Operhall, not Mr. Roof. Therefore, any discrimination was not committed by the person who terminated the plaintiff, and is not relevant to this case. *McDonald v Union Camp Corp*, 898 F2d 1155, 1161 (CA 6, 1990).

Even if Ms. Achterhoff's hiring was relevant to the plaintiff's claims, the lead opinion oversimplifies the facts and ignores crucial evidence that removes any suggestion of age discrimination. The lead opinion rests its conclusion on the fact that Ms. Achterhoff was less qualified than the plaintiff. However, this conclusion is based solely on the fact that Ms. Lytle had been with the defendant for a longer period. This ignores the fact that Ms. Achterhoff had ten years of supervisory human resources experience with other firms. The plaintiff had a similar number of years in a supervisory capacity with the defendant. Thus, the record actually shows that Ms. Achterhoff and the plaintiff had very similar employment histories. Moreover, Ms. Achterhoff received a degree in a human resources related field. The plaintiff had no such degree and had only partially completed a steno-

graphic course at a business college. Thus, I disagree that the comparative qualifications[5] of Ms. Achterhoff and Ms. Lytle show evidence of intentional discrimination sufficient to survive summary disposition.[6]

Finally, the lead opinion also focuses on the fact Ms. Achterhoff received greater pay than the plaintiff. However, Ms. Achterhoff was compensated from the Operhall budget, whereas Ms. Lytle was paid from the human resources budget.[7] The fact that the plaintiff was chosen for termination is consistent with the defendant's claim that it was motivated by a desire to reduce human resources costs. The lead opinion's reliance on the comparative salaries of these individuals fails to account for the significant fact that they were paid from different budgets. Indeed, this point removes the aberration that the lead opinion sees in the defendant's presentation.[8]

---

[5] The lead opinion apparently reads this phrase to mean comparable qualifications. *Ante* at 39-40, 46. However, I do not mean that the qualifications of the plaintiff and Ms. Achterhoff were similar. Rather, when compared, their qualifications reveal no evidence that discrimination motivated the decision to retain Ms. Achterhoff. See *Webster's New World Dictionary* (3d college ed), p 283.

[6] It is not sufficient for the employee to merely show a question of fact concerning qualifications. Rather, a plaintiff must offer proof that she was more qualified than the employee who received the position in order to present evidence of intentional discrimination at this stage of the analysis.

[7] Again, the plaintiff has not presented any proof suggesting that this arrangement was fraudulent. Rather, it is uncontroverted that this arrangement was a legitimate effort to reduce the human resources budget.

[8] The fact that Ms. Achterhoff's salary was not paid from the human resources department's budget is consistent with the employer's stated business reason that it terminated Ms. Lytle as part of a reduction in the human resources budget. Rather than show evidence of falsity, this supports the employer's proffered explanation. Thus, the lead opinion's reliance on the retention of Ms. Achterhoff as evidence of falsity and discrimination is misplaced.

*Martin v Teledyne Brown Engineering*, 924 F Supp 1131, 1138, n 4 (SD Ala, 1996) (finding that only employees within the plaintiff's department

I believe that Ms. Achterhoff's hiring is irrelevant to Ms. Lytle's termination and does not present evidence of discriminatory intent, even if considered. Thus, I cannot agree with the lead opinion that this created a question of fact concerning either the falsity of the defendant's proffered business reason or the presence of intentional discrimination.

### 2) THE HIRING OF JEFF BILLINGSLEY

Similarly, the assignment of the training responsibilities at the Whitehall Division to Mr. Billingsley does not constitute evidence of discrimination. The lead opinion finds discrimination in the retention of Mr. Billingsley. *Ante* at 41, 47. However, this ignores several crucial facts. First, Mr. Billingsley was only five years younger than the plaintiff. I fail to see how this difference provides evidence of age discrimination.

Second, Mr. Billingsley had been working with a different department of the corporation since 1986. Thus, he was not hired into the corporation as Ms. Lytle left. Rather, he was merely given a new position as head of training as an expansion of his existing duties. While the lead opinion is correct that Mr. Billingsley had production experience, he had been training and development manager for the year preceding his promotion. Even the plaintiff acknowledged that Mr. Billingsley's previous job had been in training and that the new position focused on training as well. Further, the lead opinion ignores testimony that the defendant was changing its production methods, and that this process was going to require exten-

should be considered similarly situated because the defendant had conducted its reduction in force on a "department-by-department basis").

sive retraining. Mr. Roof gave uncontroverted testimony that Mr. Billingsley had been conducting this type of training with other divisions of the corporation. It is unclear that the plaintiff had comparable qualifications. Rather, the lead opinion simply assumes that the plaintiff could have performed this job solely on the basis of her nineteen years working in the human resources department. However, even assuming that the plaintiff was qualified, Mr. Billingsley's previous training experience with the company's new production methods provides ample justification for the defendant's decision. I fail to see how the plaintiff has offered evidence of discrimination.

The lead opinion also finds evidence of discrimination in the fact that Mr. Billingsley earned a greater rate of pay. However, this ignores the fact that only a part of Mr. Billingsley's salary came from the human resources budget. In contrast, the plaintiff's salary was paid entirely out of that budget, and she was terminated in an effort to reduce the costs of the human resources department. Thus, despite the lead opinion's description of events, Mr. Billingsley was given a newly created post that consolidated functions previously held by different departments. This type of personnel change is inherent in corporate restructuring and does not constitute evidence of discrimination.

I cannot agree that the defendant's treatment of Ms. Achterhoff and Mr. Billingsley evidences age discrimination. This defendant was reducing its work force— a process that involved the elimination of jobs and the reassignment of employees. The mere fact that two of the people retained happened to be younger than the plaintiff should not allow the plaintiff to raise a material question of fact concerning age discrimination. *Matras, supra* at 688.

## B. SEX DISCRIMINATION

I also disagree that the record reveals evidence of sex discrimination. I agree with the lead opinion that the isolated confrontations with Mr. Malady are insufficient to constitute evidence of discrimination. However, for the same reasons as discussed above, I do not feel that the hiring of Mr. Billingsley shows evidence of sex discrimination. Further, I fail to understand why the lead opinion ignores the employer's evidence that six of the eight people who took over the plaintiff's job duties were women. The plaintiff does not dispute this. Indeed, she testified that she was uncertain who had taken over her job duties and acknowledged that several of her former duties were assigned to female employees. This distribution of the plaintiff's job duties is inconsistent with sex discrimination. Rather, it is consistent with the employer's desire to reduce its payroll by eliminating the number of people working in its human resources department.[9] Therefore, I do not believe that the plaintiff has shown that the defendant's nondiscriminatory business reason was false or that discrimination on the basis of sex was the true motive for its actions.[10]

---

[9] I also question the lack of importance that the lead opinion gives to Ms. Achterhoff's hiring in its discussion of the sex discrimination claim after finding it relevant on the question of age discrimination. The lead opinion also misinterprets my reference to the number of females who assumed the plaintiff's job duties. I do not feel that the "plaintiff could only establish her claim if defendant corporation had discharged all its female employees." *Ante* at 43, n 49. Rather, I simply would not ignore the fact that the plaintiff's job responsibilities were awarded to mostly female employees. This evidence mitigates against a finding that "one sex has been treated differently." *Id.* Indeed, the lead opinion's reliance on the retention of one male employee amounts to a finding of discriminatory animus because the defendant did not fire all its male employees.

[10] The lead opinion repeatedly refers to the need to review all the circumstances of the plaintiff's discharge. I am well aware of the requirement that the facts of a case must not be viewed "in a vacuum." See *ante*

### III. CONCLUSION

While I agree that summary disposition of the wrongful-termination claim was properly awarded to the defendant, I disagree with the lead opinion's finding on the discrimination claims. That finding misapplies the governing law and oversimplifies the facts of this complex case. Essentially, it allows a plaintiff to overcome summary disposition if the plaintiff can identify anyone who: 1) has less seniority, 2) receives greater compensation, and 3) does not share in the plaintiff's characteristics. Apparently, it is irrelevant if the retained individual's job was different than that held by the plaintiff or if that individual was qualified for the job. Rather, the lead opinion second-guesses the employer's decisions on the basis of its assumptions concerning which employee was more qualified. Under this holding, I fail to see how any employer could conduct a reduction in force without facing an employment discrimination trial for each and every individual it terminates. I cannot agree that this is the correct application of current employment discrimination law.

WEAVER, J., concurred with BRICKLEY, J., only with respect to the discussion of age and sex discrimination.

---

at 45. I merely would not allow a plaintiff to compile numerous irrelevant and insignificant events to provide evidence of discriminatory intent.